**BOSTON & M. R. R. v. MEECH.**
**No. 4145.**

Circuit Court of Appeals, First Circuit.
June 12, 1946.

Writ of Certiorari Denied Oct. 28, 1946.
See 67 S.Ct. 124.

Francis P. Garland, of Boston, Mass. (Hurlburt, Jones, Hall & Bickford, of Boston, Mass., on the brief), for appellant.

Thomas H. Mahony, of Boston, Mass. (C. Edward Rowe, of Athol, Mass., and Jay Walter Mead, of Orange, Mass., on the brief), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is an appeal from a judgment entered upon a verdict returned for the plaintiff in an action brought under the Federal Employers' Liability Act, 45 U.S.C.A. chapter 2, §§ 51–60, to recover for the death of the plaintiff's intestate. The complaint is in two counts; the first alleging that the decedent met his death by reason of the negligent operation of one of the defendant's locomotives, the second alleging that the decedent's death was caused by the defendant's failure to provide him with a reasonably safe place in which to work. The verdict was returned without specification of the count upon which it was based and may, therefore, have been based upon either or both.

The questions before us on this appeal are whether the evidence upon either count is sufficient to support the verdict, and whether the court below erred in refusing to charge as requested. There is no question of the applicability of the act under which this action is brought.

At the time of his death the decedent had been employed by the defendant for about three months to work in and around its engine house in Deerfield, Massachusetts, as a machinist's helper. On the night of the accident (it occurred on June 28, 1944, at about 1:45 a. m.) the decedent had been assigned by his immediate superior to the work of "stripping" incoming locomotives. This work consisted in removing the lanterns, oilers, and small tools from locomotives as they came in off the road and putting that equipment in the "equipment building", so called, where it was cleaned and then stored until it was replaced on a locomotive in the course of making it ready to go out on the road again.

Ordinarily, if not always, "stripping" was done from a structure just outside the engine house known as the "washstand". This consisted of two parallel wooden platforms about 100 feet long, 6 feet wide, and 5 or 6 inches above ground level, on either side of a track which ran substantially east and west and connected the turntable in the central area of the engine house with the railroad yard outside. The distance between the inner edge of each platform comprising the washstand and the rail adjacent thereto was 1.6 feet and locomotives such as the one which struck the decedent overhang the rails some 2 feet and 8 inches and thus overhang each platform of the

washstand about 1.2 feet or 15 inches. Locomotives were ordinarily "stripped" from the platform on the northerly side of the track since that platform was adjacent to the equipment building.

Just prior to his death the decedent was standing near the northerly edge of the southerly platform apparently facing in the general direction of the turntable and thus in the path of but oblivious to the approach of the locomotive being backed into the washstand from the yard to be "stripped" which struck and killed him. This locomotive was being operated at the time by a "hostler" who was sitting in the engineer's seat on the right hand side of the cab at the controls. It is not disputed that from his seat the hostler could not see a person standing where the decedent must have been standing when struck because of the obstruction to the range of his vision caused by the tender and the coal in it. It is further conceded that the locomotive was moving slowly, in fact that it was coming to a stop, when it struck the decedent; that a search light on the rear of the tender was burning; that the washstand was brightly illuminated by stationary electric lights in the vicinity; and that the weather on the night of the accident was clear. Since there is direct evidence from the hostler and from some other workmen in the vicinity that the bell on the locomotive was ringing while it was being backed into the washstand, we may assume this to be the fact in spite of the testimony of another workman who said that he did not remember whether its bell was then ringing or not. It is not disputed that no whistle signal was given from the locomotive as it approached the washstand.

In our opinion, in view of recent decisions of the Supreme Court in actions of this sort,[1] the foregoing recitation of the facts indicates that there is more than a scintilla of evidence (Brady v. Southern Railway Co., 320 U.S. 476, 479, 64 S.Ct. 232, 88 L.Ed. 239, and cases cited) to support the verdict upon either count.

It may be that the locomotive was being operated in the way usual and customary for the maneuver which resulted in the death of the decedent, but nevertheless the fact remains that it could have been operated more carefully. Another man could have been assigned to ride with the hostler to keep a lookout from the fireman's side of the cab or from the rear of the tender for workmen in the vicinity of the engine house, who might be presumed to be busy and hence inattentive at times to their own safety, or the whistle on the locomotive could have been sounded as it drew into the washstand to warn the man assigned there, as the decedent had been, to "strip" it.

The sufficiency of the evidence to support the verdict on the second count is at least equally clear. The defendant might have painted lines on the platforms of its washstand to indicate the extent to which locomotives overhang them, and thus to warn persons on the platforms of the danger incident to standing near their inner borders, or it might even have set the platforms of its washstand back from the tracks far enough to prevent locomotives from overhanging them at all.

From the foregoing, it is clear that although some precautions were taken for the decedent's safety, further precautions were possible, and from this it follows, as we read the decisions cited above, that there was an "evidentiary basis" for submitting the issue of the defendant's causal negligence to the jury, and hence that our "function is exhausted." Lavender v. Kurn et al., supra, [66 S.Ct. 744.]. Also we think it evident from what we have said that although the decedent could readily have taken more care than he did for his own safety either by standing back from the edge of the platform, or by watching more closely for locomotives coming in from the yard, or by standing on the northerly platform upon which his presence would normally be anticipated and where he would be in the hostler's range of vision from the engineer's seat, still we cannot

---

[1] Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967; Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520; Blair v. Baltimore & O. R. Co., 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490; Lavender v. Kurn et al., 66 S.Ct. 740.

say that as a matter of law his carelessness was the sole proximate cause of the accident.

Nothing needs to be added to what has already been said in order to dispose of the two instructions requested by the defendant and denied by the court below. These read:

"19. The defendant owed no duty to have a lookout stationed on the rear end of the tender as it was backing toward the washstand.

"27. The defendant owed no duty to blow a whistle, it would only add to the confusion."

Obviously these requests were properly denied because, as we have indicated, the jury in reason could find that failure to provide the precautions of a lookout or a whistle signal constituted causal negligence.

The judgment of the District Court is affirmed.