## WILKERSON v. McCARTHY et al.

No. 7017.   Decided November 29, 1947.   (187 P. 2d 188.)

See 39 C. J., Master and Servant, sec. 1339. Employer's compliance with specific legal standard prescribed by or pursuant to statute for equipment, structure, or material, as defense to charge of negligence, see note, 159 A. L. R. 871. See, also, 35 Am. Jur. 647.

*Rawlings, Wallace & Black,* of Salt Lake City, for appellant.

*Farnsworth & Van Cott, Grant H. Bagley* and *Dennis McCarthy,* all of Salt Lake City, for respondents.

LATIMER, Justice.

Action for personal injuries which occurred July 26, 1945, as a result of plaintiff's falling into a wheel pit in the defendant railroad's coach yard at Denver, Colorado. The action was brought under the Federal Employers' Liability Act, Title 45 U. S. C. A. § 51 et seq. From a directed verdict of "No cause of action," plaintiff appeals. The parties will be referred to as they appeared in the trial court.

Plaintiff was employed as engine foreman in defendants' Burnham Yard at Denver, Colorado. His crew consisted of himself, two switchmen, an engineer and a fireman. Plaintiff's work consisted of general passenger car switch-

ing in the yard, making up trains, and spotting "bad order" cars for repairs.

The place of the accident was the wheel "drop pit," rectangular in shape, four feet two and one-half inches wide, and ten feet seven inches deep, with concrete walls, the top of which were flush with the level of the ground. This pit ran underneath three or more parallel tracks and was used by the pit men to change or make repairs to the wheels and trucks of the various passenger cars of the defendants. The wheel pit lay with its long axis approximately east to west, and the tracks crossing it ran approximately north to south. The tracks which crossed the pit and which are concerned in this action were identified as the Wheel Track, which lay to the west, and on which the wheels were brought to and taken away from the pit; and Track Number 23½, which is the track over which cars would be brought to the pit for repair.

When in use, the pit was enclosed on three sides, north, south, and west, by means of four corner-posts and a connecting chain; and on the fourth or east side by whatever passenger car happened to be spotted over the pit for repair. Also, when the pit was in use, all the cover boards would be removed except one called the "permanent board" which always remained in place, and possibly another, which was located immediately to the west of and adjacent to the west rail of Track 23½. It was the permanent board from which the plaintiff fell, (and which is therefore the one of paramount concern to this case). This board was 22 inches wide, 4 feet 2½ inches long, and weighed 75 pounds. It was made up of several planks bolted together, and was located in such a position that its east edge was 9½ inches to the west of the chain posts nearest Track 23½. This board crossed the pit at right angles to the long axis and parallel to the rails of Track 23½. At the time of the accident, the cover board immediately adjacent to the west rail was in place, but it was completely covered over by the overhang of the floor of the tourist sleeper then standing on the track.

To further describe the immediate scene of the accident,

the distance from the west rail of Track 23½ to the near edge of the permanent board was 45½ inches; the overhang of the car standing on the track was 31 inches; the floor of this car was a vertical distance above the ground of 44 inches; the east chain posts were 36 inches west from the west rail of Track 23½; and the east edge of the permanent board was 9½ inches west of the post nearest the track. The chain posts were 42 inches high. (These measurements are given to assist the reader in forming a picture of the space through which plaintiff squeezed in order to get onto the board from which he fell.) In other words, if a plumb bob were dropped vertically from the west side of the Pullman car to the ground, the horizontal distance between such line and the chain post nearest the car would be five inches at the ground, and would increase to approximately seven inches at the top of the post, because the post leaned slightly to the westward and away from the track. Other and wider types of passenger cars reduced this horizontal distance at the top of the post as much as two to six inches. When the pit was not in use, the posts would be removed from their sockets, the chains taken away, and the entire pit covered over by means of heavily constructed wooden boards similar to the permanent board, having angle irons or "z" irons at either end to make them fit snugly against the concrete edges of the pit.

At the time of his injury, plaintiff was seeking out a Mr. Hawkins who was employed by defendants as a car man, for the purpose of, to use the plaintiff's own words,

"to see if he was through with this particular car so the car could be moved and I could go get another bad order car that I knew were in a hurry for and spot it for him    *    *    *"

Not seeing Mr. Hawkins anywhere, plaintiff proceeded south along Track 23½ and along the west side of the car which was standing over the wheel pit, and started across the wheel pit, using the permanent board as a walkway. The safety chains were up at the time, and in order for plaintiff to cross the pit he had to turn sideways and slide between

the side of the car and the northeast chain post. He put his right hand on top of the north chain post nearest the track, turned his body sideways so that he faced west, slid through the 5 to 7 inch space between the car and the post and swung his body around the post. He then moved a few inches to the west along the north edge of the pit, placed his right foot onto the permanent board, and thereupon fell off the west side of the board into the pit, sustaining the injuries complained of.

Plaintiff was not required by the necessity of finding Mr. Hawkins to cross the wheel pit at all. He could have gone around the pit, an added distance of 40-odd feet; he could have observed whether the blue flag had been removed from the track, which would have indicated the work was finished and the car was ready to be moved; or else he could have stopped at the north side of the pit and called out for Mr. Hawkins or his helper and obtained the desired information that way.

Plaintiff testified that when he crossed this same board about an hour and a half before the accident, he observed some grease or oil on the board; and that at the time of the accident he felt as if his foot slipped. The evidence was that the car men coming up out of the wheel pit would track some grease and oil onto this board, and further, that defendants had not cleaned off the board for the past eight months prior to the accident, though they did clean out the bottom of the pit once or twice a week.

Plaintiff testified that prior to installation of the safety chains it was the practice of the men working generally in the yard to cross the wheel pit by means of the permanent board, and that there was no change in this practice after the chains were put up, other than that the men had to go around the post and between it and the side of the car standing on the track. Plaintiff further said that he had never received any instructions forbidding him to cross the pit in this manner. However, the testimony in regard to the claimed practice of employees going between the posts and the cars was directly contradicted by Elledge, the

general car foreman; by Hawkins, the car man working at the pit; and by Johnson, a flagman, all of whom testified that, since the chains were put up, they had never seen anyone other than the car men working in the pit cross the pit by means of the permanent board.

Much has been said in recent cases about the lengths to which the Supreme Court of the United States has gone in requiring submission to the jury of cases arising under the Federal Employers' Liability Act. And much has been said about how a failure to submit a case to the jury deprives plaintiff of a constitutional right. Illustrative of how far one of the Federal Courts has gone in its analysis of the recent decisions of our highest court is the following quotation from *Griswood* v. *Gardner*, (7 Cir.), 155 F. 2d 333, 334:

"The Supreme Court, commencing with *Tiller* v. *Atlantic Coastline R. Co.*, 318 U. S. 54, 63 S. Ct. 444, 87 L. Ed. 610, 143 A. L. R. 967, in a succession of cases has reversed every court (with one exception hereinafter noted) which has held that a defendant was entitled to a directed verdict. In the Tiller case, the Supreme Court reversed the Court of Appeals for the Fourth Circuit, 128 F. 2d 420, which had affirmed the District Court in directing a verdict. The case, upon remand, was again tried in the court below, where a directed verdict was denied. For this denial the Court of Appeals reversed and again the Supreme Court reversed the Court of Appeals, holding that the District Court properly submitted the case to the jury. In *Tennant* v. *Peoria & P. U. R. Co.*, 321 U. S. 29, 64 S. Ct. 409, 88 L. Ed. 520, this court reversed the District Court on account of its refusal to direct a verdict, and our decision [7 Cir.], 134 F. 2d 860, was reversed by the Supreme Court. In *Bailey* v. *Central Vermont Ry.*, 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1444, the Supreme Court of Vermont held that there should have been a directed verdict for the defendant, and the Supreme Court reversed the decision of that court. In *Blair* v. *Baltimore & O. R. Co.*, 323 U. S. 600, 65 S. Ct. 545, 89 L. Ed. 490, the Supreme Court reversed the Supreme Court of Pennsylvania which had held that there should have been a directed verdict. In the recent case of *Lavender, Administrator, etc.*, v. *Kurn et al.* [327 U. S. 645], 66 S. Ct. 740 [90 L. Ed. 916], the Supreme Court reversed the Supreme Court of Missouri which had held that there should have been a directed verdict for each of the defendants."

There are, however, at least two good reasons why the statements set forth in the foregoing opinion are not persuasive in this case. The first is, consideration has been given only to those cases wherein the Supreme Court granted certiorari; and the second is, that in all those cases, the Supreme Court re-affirmed its holding that plaintiff, in order to recover must still show negligence on the part of the employer.

In two of the latest pronouncements by that court, the rule requiring plaintiff in a suit based upon the F. E. L. A. to establish negligence of the employer, is re-affirmed. In *Ellis* v. *Union Pacific R. Co.*, 329 U. S. 649, 67 S. Ct., 598, 600, 91 L. Ed. ——, ——, decided February 3, 1947, reversing 146 Neb. 397, 19 N. W. 2d 641, is found the following quotation:

"The Act does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur. And that negligence must be 'in whole or in part' the cause of the injury. 45 U. S. C. A. § 51. *Brady* v. *Southern Ry. Co.*, 320 U. S. 476, 484, [245], 64 S. Ct. 232, 236, 88 L. Ed. 239. Whether those standards are satisfied is a federal question, the rights created being federal rights. *Brady* v. *Southern Ry. Co.*, supra; *Bailey* v. *Central Vermont R. Co.*, 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1444."

In *Jesionowski* v. *Boston & M. R. Co.*, 329 U. S. 452, 67 S. Ct. 401, 404, 91 L. Ed. ——, reversing 1 Cir., 154 F. 2d 703, the court said:

"* * * Thus, the question here really is not whether the application of the rule relied on fits squarely into some judicial definition, rigidly construed, but whether the circumstances were such as to justify a finding that this derailment was a result of the defendant's negligence. We hold that they were."

While the *Ellis* case, supra, holds that whether or not the standards of care required of an employer are satisfied is a federal question, it does not hold that a trial court is precluded from directing a verdict where there is no substantial evidence in the record to show the employer has not satisfied the standards of care required of him.

If we follow the rule set out in the case of *Brady* v. *Southern Ry. Co.*, 320 U. S. 476, 64 S. Ct. 232, 88 L. Ed. 239, then we must determine from the record whether or not there is more than a scintilla of evidence of defendant's negligence. If there is, then the court erred in directing a verdict; otherwise, it did not.

The record indicates the following factual situation in regard to whether or not the plank was a "place of work" for the plaintiff. For some time prior to the first day of May, 1945, the wheel pit had not been enclosed with chains, and, according to plaintiff's witnesses, the employees of the defendants working in the yard were accustomed to use the permanent board as a footpath across the pit. While the record is silent as to the following, it can be reasonably inferred that prior to the time the chains were put up, the pit was a hazard to both employees and other persons who might be passing through that area. Even plaintiff conceded in his testimony that he thought the chains were placed around the pit to keep people from falling in. Prior to the time the pit was enclosed, the testimony indicates a custom was prevalent on the part of the switchmen and pit crewmen to walk across the board, and the evidence may be adequate to show this custom was of sufficient notoriety, and indulged in over such a length of time as to charge defendants with knowledge of its existence. However, defendants, nearly three months before the accident, attempted to stop this practice by enclosing the pit. This is not the case in which an employer attempts to stop an unsafe practice by publishing written notice to employees to discontinue. No rules or regulations to prohibit the practice were promulgated. Instead, the defendants adopted a different, and we think a more effective method of notifying employees generally in the yard to stop the practice of crossing the wheel pit. They blocked the path.

If, as indicated by the testimony, the employees of defendants were using the plank as a crosswalk prior to May 1, 1945, was the erection of the guard chains and posts on or about that date notice to those not working in the pit

that the plank was no longer thereafter to be used as a pathway? And, if the chains were notice to switchmen and to the plaintiff, was the fact, if it be a fact, that switchmen were ignoring the barricade and continuously disregarding the purpose of the chains, directed to the attention of the defendants? These questions must be answered to properly determine defendants' negligence, for the reason that negligence in not furnishing plaintiff a safe place to work is dependent in part upon whether defendants could reasonably expect plaintiff to use this plank in carrying out his duties. Some types of work are inherently dangerous, and require considerably higher safety standards than do others, and an employer must bear this in mind in maintaining the premises where workmen are required to be. In this particular situation, if the defendants could have reasonably anticipated that switchmen were going to use the method adopted by plaintiff in crossing the pit, the erection of the chains, rather than being a safety measure, would have been negligence, as the chains did in fact make the crossing of the pit, by means of the board, more hazardous. It required the employee to depart from a straight course, swing himself through a narrow space of five to seven inches, step over at least a 9½ inch open space, and approach the board from an angle that would have a tendency to cause a man to slip and fall.

To hold that the defendants did not intend to close off the plank as a place to work for employees generally would be to accept a most unreasonable inference. In treating the question of notice to appellant, the following facts are significant. It was not necessary for appellant at the time of his injury, or for aught that appears, at any other time, to use this particular pathway. Other and safe routes were open to him. The construction of the enclosure was such that with a standard tourist car there was not to exceed seven inches in clearance between the overhang of the car and the guard post. On wider cars, the clearance was less. To an ordinary reasonable person it was obvious that the railroad company had intended to close this pathway to all

traffic crossing the pit. There just would not be any sense or logic in forcing plaintiff to go to the extent of literally squeezing himself between the post and car if it were intended to permit his continued use of the crossing. Chains running parallel with the plank might have been helpful, but chains running at right angles to the plank could be of no assistance, rather they would be an extra hazard.

The evidence quite conclusively shows that the board had its place in the scheme of things in the repair yard, and that its principal purpose was for the use of the pit crew. The members of this crew had to use it to get from one side of the pit to the other and had to use it to get down into and out of the pit. Besides, they used it as a brace when doing certain kinds of work. Most of the use was while they were working in the pit, although the evidence is susceptible of being interpreted to the effect that the pit crew used the board for crossing the pit inside of the chains. Even though the latter use be conceded, such use does not extend to all other workmen in the yard. A pit man may be required to cross a plank to get into or across the pit, and a brakeman may be required to climb a ladder to get onto a car, but neither of these means should be used except by those employees whose duties reasonably require their use. And particularly they should not be used when they unreasonably increase the risk to be encountered by the employee. In this particular case, the board appears adequate for the use of the pit crewmen, but entirely inadequate if intended to be a cross walk for other employees. Employees climbing in and out of the pit approach more deliberately, use other and different hand-holds, and are more careful of their footing, while employees swinging on to the plank in a hurry are apt to forget about the slippery condition of an oily board and forget about the dangers incident to crossing, as did the plaintiff, who swung himself around the chain post and onto the plank. Defendants must have appreciated the dangers of an open pit with an unguarded passageway across it, and have installed the safety chains to warn employees of the danger. Had they

not intended to preclude the use of the board as a walk-way, the defendants would not have installed the chain posts so as to block an open straight approach to the board. Accordingly, we hold that the installation of the chain and posts was notice by defendants to all employees generally in the yard that the board was not to be used as a walk-way for crossing the pit.

Such being the case, did plaintiff's evidence establish a subsequent use of the board for a crosswalk by carmen in such a manner as to charge defendants with notice that it was being so used? We think not. The evidence as to the custom and practice of switchmen going between the chain post and the side of the car came from the testimony of five witnesses. The three witnesses for defendants testified that they worked either in the pit or in the vicinity of the pit, over extended periods of time, and that they had never seen anyone other than pit crewmen cross the pit by means of the board after the chains were put up. This evidence given by witnesses for defendant is not referred to for the purpose of suggesting that this court is reconciling the dispute, if any. It is referred to solely for the purpose of showing that defendants' evidence in no way added to that produced by the plaintiff.

The plaintiff and one witness called by him testified in regard to the use of the board as a pathway and the following is the record of their testimony. Plaintiff testified as follows:

"Q.  I will ask you to state whether or not you observed any practice with reference to crossing over the pit when men were working on the cars there in the daytime before these chains were installed? A.  Walked right straight across the board.

"Q.  Was there a board usually there to walk over? A.  Yes, sir.
"Q.  Was there any change in that practice after the chains were installed? A.  None, only they had to walk around the chains.
"Q.  At any time while you were working in the yards there before you were injured, did you ever receive any instructions from anyone forbidding you to cross over the pit? A.  No, sir.

312

"Q. You may state whether or not you observed men cross over the pit as you have indicated here on more than incidental occasions. A. Yes, sir.

"Q. What did you observe with reference to the number of times, the occasions, when men would cross over the pit. A. Oh, I couldn't say; I suppose maybe a hundred times; varies, men, both switchmen and car men or others working there in the yard necessary, pullman employees and so forth.

"Q. Crossed over the pit? A. Yes, sir, it was a common practice for everybody to use that way."

It will be noted from this testimony that it is in no way limited as to dates or employees. The witness could have been talking about the time before the chains were installed, the time after the chains were installed, or both. If we assume the most favorable version to the plaintiff, this would establish the time as after the chains were installed, but there is no way of telling how much of the use must be credited to the car or pit men, who were constantly using the board in connection with their duties, and how much of the use was chargeable to the switchmen.

The other witness for plaintiff, Arbogast, testified as follows:

"Q. During the period of time between the installation of these safety chains and posts and the time when Mr. Wilkerson was injured, I will ask you to state whether or not you ever passed over that board at the west of the post by passing between the post and the standing car while that crew was there working? A. Yes, sir, I remember of two occasions that I passed through there.

"Q. During that period of time? A. Yes, sir.

"Q. While the crew was working. A. Yes, sir.

"Q. Have you seen any other switchman working there in the yards act similarly; that is, go around the post, between the post and the car and pass over the board? A. Yes, sir, I have saw my helpers at different times and before the chains were placed, we used the board at all times, you know, just to cross the pit. I have walked across the pit a number of times that way, and also my helpers.

"Q. I am interested in the occasions when the board has been crossed after the chains were installed. A. Yes, sir. I have saw a fellow by the name of Mason and fellow by the name of ———— that helped me quite a long time.

"Q. They were switchmen? A. Yes, sir, that crossed the board.

"Q. Crossed the board while car was standing over the wheel pit. Did they cross while a car was standing in the wheel pit? A. Yes, sir."

An examination of this evidence shows the witness could identify two switchmen who crossed the plank during the three months period, but it is entirely lacking in those elements necessary to show acceptance of a custom or practice by acquiescence. The use by employees other than the two is confused between the times before and the times after the installation of the safety chains.

This case is analogous to a case involving the doctrine of waiver of a rule by non-enforcement, and a similar principle of law is involved. Here the employer has furnished a reasonably safe place to work, but is charged with negligence because it has failed to prevent a claimed practice which rendered an otherwise safe place, unsafe; the employer being charged with knowledge of the disregard of his warning chains, because of the notoriety with which the employees have used the plank after the erection of the guard chains, and the length of time the practice has been in vogue. To impose this duty on the employer, the board must have been used as a place to work by others than the pit crew, so openly and habitually and for a long enough period of time to raise the presumption that the defendants or those appointed by them had consented to the use or acquiesced in it. If the trial court could say, as a matter of law, that plaintiff had failed to establish, by any substantial evidence, either the time or the notoriety element, then the directed verdict was proper. In the present instance the chains and posts enclosure had been erected and in use approximately three months. The pit was completely covered when not being used by the pit crew and during the covered period the planks could have been used as a walkway with safety. The pit crew was required to use the plank to get from one side of the pit to the other, so the use of it by the pit crew while working in the pit would not be notice to the defendants that the

plank was being used by other employees. The only period that plaintiff could rely upon to show use would be the time when the pit was uncovered and the posts and chains in place, and the practice would be limited to the use of the board as a walkway. The evidence of plaintiff, at the most, established a questionable, sporadic and occasional use of the board in the manner contended for by him, and for a short period of time. This is not sufficient to charge the appellants with notice of the unsafe practice. The evidence falls short of that required to establish a presumption that the defendants had consented to or acquiesced in the improper use of the board as a pathway. There must be a limit beyond which the employer need not go to protect the employee. If not, then the erection of barricades, the construction of safety devices, and other protective measures do not assist in relieving the employer from liability. They add additional burdens upon him. If he erects one or many, he must, at his peril, see that the employees do not disregard its purpose or their purposes. Failing to do this, he becomes negligent, not because he has failed to provide a safe place to work, but because the employees pay no attention to the safety devices furnished for their protection. While we hold an employer must use reasonable means to protect employees, when, as here, an effective measure has been taken to close off a walkway over a pit to a class of employees, before one of that class can disregard the warnings and recover for injuries sustained while using the closed area, the evidence of consent or acquiescence in the use by the employer must be substantial that the period of use, in the manner contended for, was of such duration and the use so habitual and of such notoriety that a reasonably prudent employer could be presumed to have consented to the use. The record fails to disclose sufficient evidence to meet the requirements.

Plaintiff sets out three separate grounds as to why he claims the premises were unsafe. Firstly, that the defendants caused a loose plank to be set over the wheel pit, and

due to its insecurity the plank turned when plaintiff stepped on it. Secondly, that defendants caused plaintiff to pass over the wheel pit and at a time when the plank was insecurely attached to the sidewalks. Thirdly, defendants permitted grease and oil to accumulate on the plank, and this,. together with the narrowness of the plank, caused plaintiff to slip and lose his balance.

With respect to plaintiff's first and second specifications of defendants' failure to provide him with a safe place to work, the court was not in error in holding against the contention of the plaintiff, as there was not sufficient evidence to submit these questions to the jury. Plaintiff was the only witness who gave testimony on the insecurity of the board, and even he made no claim that the board was improperly constructed, so as to be insecure. The substance of plaintiff's testimony on these two specifications was that the plank felt to him like there was a little rock or gravel which caused it to tip. That he was guessing about the rock and gravel, but it felt like it tipped or tilted. However, he had gone across the plank approximately 1½ hours before, and at that time it was solid. Other witnesses testified to the construction of the board, and the manner in which it was affixed to the sides of the pit, and all agreed that the board fit firmly and that there was no play in it. That the permanent board was for the use of the pit crewmen, and was used as a brace by them while working on the cars.

One witness who worked in the pit testified that he heard some one yell for help, and he immediately went down into the pit to assist him. That he used the board to climb out of the pit within three to five minutes after plaintiff's fall, and that it was firm and secure at that time. Plaintiff and his witness, Arbogast, further corroborated the testimony of the other witnesses by their statements that they had used this board as a pathway. Their testimony is silent as to the insecurity of the board at these other times. When this evidence is considered together with the board itself,

which was introduced as an exhibit, and the photographs of the pit showing the board in place, it can be definitely stated that plaintiff's guess as to the tipping was not sufficient to raise a reasonable inference of any insecurity of the board.

The other specification of negligence presents a much more difficult problem and directly relates to the previous discussion of what constitutes a "place of work" for plaintiff.

The reason for discussing defendants' knowledge, either actual or constructive about the use being made of the plank, is for the purpose of determining whether the maintaining of a 22-inch board for a walkway, which is almost certain to become greasy or oily, constitutes negligence. It must be conceded that if defendants knew or were charged with knowledge that switchmen and other workmen generally in the yard were habitually using the plank as a walkway in the manner claimed by plaintiff, then the safety enclosure might be entirely inadequate, and a jury question would have been presented on the condition of the board and the adequacy of the enclosure.

It seems inconceivable that the defendant company would construct a safety chain and block the use of a pathway only to increase the danger to part of the personnel expected to use the plank. The eastern posts were placed as close to the track as was reasonably possible, and plaintiff had to do the unusual to discover a way to get hurt. To require an employer to furnish a place to work so safe that an employee by his own acts cannot render it unsafe, is placing an unreasonable burden on the employer. This would in effect make the master the insurer of the safety of the servant.

While the law requires the employer to furnish the employee with a safe place to work, it does not require that the master be an insurer of the safety of the servant, and maintain every "place of work" safe from negligent use by every employee. The cases cited by plaintiff do not so hold. *Thomson* v. *Boles,* 8 Cir., 123 F. 2d

487 (a case in which a brakeman fell from a bridge because of a defective railing) ; *Bailey* v. *Central Vermont Ry., Inc.,* 319 U. S. 350, 63 L. Ed. 1062, 87 L. Ed. 1444 (an employee tipping a car of coal on a trestle) ; *Boston & M. R. R.* v. *Meech,* 1 Cir., 156 F. 2d 109 (an employee stripping an engine on a washstand) ; *Ellis* v. *Union Pacific R. Co.,* 329 U. S. 649, 67 S. Ct. 598, 91 L. Ed. ——, supra, (in which an employee was killed because of an impaired clearance) ; *Lavender* v. *Kurn,* 327 U. S. 645, 66 S. Ct. 740, 90 L. Ed. 916 (a switchman hit by a hook swinging from a car) ; *Eglsaer* v. *Scandrett,* 7 Cir., 151 F. 2d 562 (Engineer falling from catwalk). In all these cases, the employee was performing his work at a place where the master had or was charged with knowledge that the servant would be. That being so, the employer must make the premises safe for those particular purposes. In this case, the defendants had no knowledge, actual or constructive, that switchmen were using the plank to carry out their tasks, and therefore, they were only required to keep the board safe for the purposes of the pit crewmen. This is not the case where the employer is charged with notice that the employee will work at the place frequently or infrequently. This is instead the case in which the employer has no reason to suspect that the employee would disregard obvious warnings and negligently cross the plank from which he fell and was injured. The evidence in this case fails to disclose that the employer was chargeable with notice that the switchmen would use the plank for a walkway. Accordingly, the standard, we hold, required of the defendants in this case, was to furnish a board safe for the purposes of the pit crewmen, and not for all the employees in the yard. With this standard in mind, neither the narrowness of the board nor the presence of a small amount of grease would present a question of negligence, as to this plaintiff. The board was wide enough for all purposes for which it was intended and with pit men repeatedly getting up onto the board from down in the pit, it would be almost a physical impossibility to keep the board continuously free from oil and grease.

In the case of *Boston & Maine R. R.* v. *Meech,* supra, the U. S. Supreme Court denied certiorari, 329 U. S. 762, 67 S. Ct. 124, and, in effect, placed its stamp of approval on a holding of the 1st Circuit Court of Appeals that the master was negligent because other reasonable safety precautions could have been taken to protect the employee. The holding in that case must be considered in the light of the facts of the case. Applying the same rule to the case at hand, it is difficult to see how defendants could have adopted other reasonable measures that would have afforded more protection to this plaintiff. The chains indicated a closed area; the hazard was readily apparent; the warning sufficient; visibility was unimpaired; plaintiff was familiar with the width, location, and depth of the pit; the condition of the board was known to the plaintiff; there were no latent defects to ensnare him; if the board had any grease on it, plaintiff knew of this fact, as he claims to have seen the presence of a small amount some 1½ hours before his fall; there was no trap to mislead plaintiff, and for all practical purposes, the gateway across the pit was closed.

Plaintiff's counsel has suggested some additional measures defendants might have taken but none of these would have added to plaintiff's protection. Two of these will be referred to. Had the chains been taken down as suggested by counsel, a safer place would not have been the result; instead, the result would have been the opposite. Also, a sign not to cross would have afforded plaintiff no additional security or warning, for he disregarded the chain and he would no doubt have ignored another form of warning. Other suggested measures might be discussed, but with little purpose. No case has yet been published wherein an employer has taken every conceivable precautionary measure to protect the employee and it is doubted that any such case will ever be reported. The burden on the defendant in this case must be kept within reason, and, from the record before us, we think the jury could have come to only one conclusion, and that is, that the defendants had discharged their duty to the plaintiff in this case by furnishing him a

safe place to work. Such being the case, the trial court did not err in directing a verdict for the defendants.

The judgment of the court below is affirmed, with costs to respondents.

McDONOUGH, C. J., and PRATT and WOLFE, JJ., concur.

WADE, Justice (dissenting).

I dissent. My disagreement with the prevailing opinion is very largely on the construction which we should place on the undisputed facts, and on the inferences which should be drawn from the evidence of a continuing use of the permanent board. The basis of my discussion of these problems will be the facts as stated in the prevailing opinion. For although those facts are not stated unduly favorably to the plaintiff yet they are sufficient for the points which I wish to make.

First as to the construction to be placed on the placing of the chains around the wheel pit. I do not think our problem is to determine what was the intention of the defendants in placing the chains as they did in that position. Our problem is rather to determine what should the defendants have anticipated would be the effect of thus placing the chains, on the employees who had in the past been using the permanent board to cross from one side of the pit to the other when the pit was open. What the defendants' intention was in so placing these chains is immaterial, the same as any other unexpressed intention which they may have had. The only thing we are concerned with is what intention did they communicate to the plaintiff and their other employees by such act. In other words since they did not expressly by oral communication or by any written statement indicate to the plaintiff and other employees that they were no longer to use this board in crossing the pit when it was open, could they reasonably anticipate that the mere placing of those chains around the pit in the manner which they were placed would be sufficient to cause the plaintiff and

other employees similarily situated to desist from using that board in crossing the pit in cases where to do so was the most convenient way to get where their work required them to go.

In determining what was the intention of the defendants in placing the chains around the pit the prevailing opinion points out that it would be more dangerous for plaintiff to pass around the post and between it and the car, and back on the permanent board and then on across the pit, with the chain there as it was placed, than it would be for him to merely walk across the board without any chain. This would have some weight in determining what were defendants' intentions in placing the chain there, but it has very little bearing in determining what should the defendants reasonably anticipate would be the effect thereof on plaintiff and other employees similarly situated. While we cannot presume that defendants would intentionally change the situation so that it would be more dangerous for plaintiff to perform his work we can infer from the facts that such was the effect of so placing the chain around the pit. And while they may have intended by placing the chain around the pit to notify plaintiff and other employees similarly situated not to use the permanent board in getting from one side of the pit to the other, still we may conclude that defendants should have known that it would not be an effective means of giving such notice. Of course the placing of the chain around the pit did have the effect of preventing some one from falling into the open pit at other places where is was not covered by the permanent board.

The evidence is undisputed that before the chain was placed around the pit, plaintiff and his crew and other employees similarly situated, when the pit was open, used the permanent board regularly to cross from one side thereof to the other; that at times their work required them to go from one side of the pit to the other and this was the most convenient way to do so; that when the pit was closed, both before and since the chain was placed around it, such employees have regularly walked over the boards which covered

it including the permanent board; that no one has ever told plaintiff that he was expected not to use this board in crossing over the pit nor has he ever been so notified in writing. The permanent board is 22 inches almost two feet wide, it weights 75 pounds, it consists of three heavy planks firmly bolted together and it fits firmly in a groove made therefor on the sides of the pit. It gives ample room for a person to walk across it and its appearance would suggest that it was put there for that purpose. The prevailing opinion suggests that it would only be 40 feet further to go around the pit, to have to go that much farther would seem to a man busy at work too far to go around when he could get where he was going merely by stepping over or stooping under a chain or by swinging around the post as plaintiff did. It is also clear that the men working in this pit regularly used this board in crossing from one side thereof to the other. Under these circumstances, since the danger is doing so without stopping to consider the possibilities is not apparent, and since human experience teaches that busy men do often take such chances, in my opinion the defendants had they acted as ordinary, prudent men, would have anticipated that the plaintiff and the other employees who were similarly situated would continue to use this board to cross the pit just as they had used it before the chain was placed there. To me it seems that this is the thing that you would naturally expect them to do.

This is not exactly the negligence which plaintiff pleaded. But the evidence of such negligence was supplied by both parties without any objection that either part was surprised thereby and not prepared to meet it. By the nature of this evidence it was of necessity developed in showing the facts as they existed which facts were relevant to the issues as made by the pleadings. It is a well recognized rule in this and other courts that where plaintiff alleges a wrong committed in one manner and the defendant proves that he did not commit the wrong in the manner alleged but did commit that same wrong in a different manner, that the court may award judgment in plaintiff's favor on the basis of the facts

as proved. I think the principle involved in that kind of a case is applicable here. It would probably have been better had plaintiff asked leave to amend his complaint to conform to the proof, but as long as the proof was before the court and no one had been deprived of full opportunity to rebut or disprove it I think that question should have been submitted to the jury.

It may well be that plaintiff himself was guilty of contributory negligence in attempting to cross the pit on this board by swinging around the post as he did. Obviously had he stopped to think he would have recognized that to swing around this post was more dangerous than to go around the pit, or to step over or stoop under the chain. But under the Federal Employer's Liability Act contributory negligence is not a defense. If the evidence shows that the defendants' negligence was a contributing proximate cause of the accident that is all that is necessary. In this case, in my opinion, all that was necessary was that a showing be made that the defendants as reasonable persons should have anticipated that plaintiff and the other employees similarly situated would continue to use this board in crossing the pit and that in so doing the place to work was unsafe. This question I think should have been submitted to the jury.

Even if we were to conclude that the placing of this chain around the pit was in itself sufficient notice to plaintiff and the other employees similarly situated that they should not use this board to cross the pit when it was open, I think the evidence is sufficient from which the jury could reasonably find that such employees had continued to so use this board after the chain was placed around the pit the same as they used it before so as to notify the defendants of such use and that in view of such use this was an unsafe place to work. In my opinion neither the record nor the extracts therefrom quoted in the prevailing opinion can be read without concluding that plaintiff and his witness were positively testifying that after the chain was placed there, plaintiff and his crew and the other employees similarly situated continued to use this board to cross the pit whenever

it was convenient for them to do so, as they did prior to the placing of the chains, and that neither of them receded from this positive testimony or testified contrary thereto on cross examination. While plaintiff's witness on cross examination only mentioned the names of two persons and two occasions when he saw such employees crossing the board when the pit was open after the chain was placed around it, this does not mean that those two occasions were the only ones where he saw such employees cross the board after the chain was placed around the pit. It only means that those two occasions were all that readily came to his mind. It might well be that he could have seen such employees cross that board over and over again and still only be able to recall two specific events when that had occurred. If that had become a common occurrence in his day's work, it would be natural that he would not retain them so that he could mention each one of such events.

Nor do I agree that the fact that three other employees of the defendants testified that they had not seen plaintiff or any other employee similarly situated cross the board when the pit was open after the chain was placed around it, was very strong evidence that such was not the custom. It is not shown that had this been the custom that these witnesses would have remembered seeing this happen, these witnesses were not shown to have been there constantly nor was it shown that had they seen such employees so cross the board that they would have remembered it. So their testimony is not necessarily in conflict with the testimony of plaintiff and his witness. But even if it were, in my opinion, it is still a question of fact for the jury and we cannot determine this fact against the plaintiff as a matter of law.

I therefore am of the opinion that this case should have been submitted to the jury on these issues.