# WILKERSON *v.* McCARTHY ET AL., TRUSTEES.

No. 53.   Argued December 6, 1948.—Decided January 31, 1949.

*Parnell Black* argued the cause for petitioner. With him on the brief were *Calvin W. Rawlings* and *Harold E. Wallace.*

*Dennis McCarthy* argued the cause for respondents. With him on the brief was *Waldemar Q. Van Cott.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The petitioner, a railroad switchman, was injured while performing duties as an employee of respondents in their railroad coach yard at Denver, Colorado. He brought this action for damages under the Federal Employers' Liability Act.[1]

The complaint alleged that in the performance of his duties in the railroad yard it became necessary for him to walk over a wheel-pit on a narrow boardway, and that due to negligence of respondents, petitioner fell into the pit and suffered grievous personal injuries. The complaint further alleged that respondents had failed to furnish him a safe place to work in several detailed particulars, namely, that the pit boardway (1) was not firmly set, (2) was not securely attached, and (3) although only about 20 inches wide, the boardway had been permitted to become greasy, oily, and slippery, thereby causing petitioner to lose his balance, slip, and fall into the pit.

---

[1] 35 Stat. 65 as amended by 36 Stat. 291 and 53 Stat. 1404, 45 U. S. C. §§ 51–59.

The respondents in their answer to this complaint admitted the existence of the pit and petitioner's injuries as a result of falling into it. They denied, however, that the injury resulted from the railroad's negligence, charging that plaintiff's own negligence was the sole proximate cause of his injuries. On motion of the railroad the trial judge directed the jury to return a verdict in its favor. The Supreme Court of Utah affirmed, one judge dissenting. —— Utah ——, 187 P. 2d 188.

The opinion of the Utah Supreme Court strongly indicated, as the dissenting judge pointed out, that its finding of an absence of negligence on the part of the railroad rested on that court's independent resolution of conflicting testimony. This Court has previously held in many cases that where jury trials are required, courts must submit the issues of negligence to a jury if evidence might justify a finding either way on those issues. See, *e. g., Lavender* v. *Kurn,* 327 U. S. 645, 652–653; *Bailey* v. *Central Vermont R. Co.,* 319 U. S. 350, 354; *Tiller* v. *Atlantic Coast Line R. Co.,* 318 U. S. 54, 68; and see *Brady* v. *Southern R. Co.,* 320 U. S. 476, 479. It was because of the importance of preserving for litigants in FELA cases their right to a jury trial that we granted certiorari in this case.

The evidence showed the following facts without dispute:

Petitioner fell into the pit July 26, 1945. The pit, constructed in 1942, ran approximately 40 feet east and west underneath three or more parallel tracks which crossed the pit from north to south. The pit was 11 feet deep and 4 feet 2½ inches wide with cement walls and floor. Car wheels in need of repair were brought to the pit, lowered into it, there repaired, and then lifted from the pit for return to use. When not in use the pit was kept solidly covered with heavy boards. These

boards were used as a walkway by all employees. When the pit was in use the cover boards were removed except one 75 pound "permanent board" 22 inches wide and 4 feet 2½ inches long. While the solid covering was off, this "permanent board," built to fit snugly and firmly, was unquestionably used as a walkway by *all* employees up to about May 1, 1945.

On this latter date, the railroad put up "safety chains" fastened to guard posts, inclosing 16½ feet of the pit, on its north, south and west sides. The posts, 42 inches high, fitted into tubes imbedded in the ground, the tubes being larger than the posts—enough larger to allow the posts to work freely. The chains, attached 2 inches from the top of the posts, were to be kept up while the pit was in use and taken down when the pit was not in use. They were up when plaintiff slipped from the "permanent board" into the pit. At that time a tourist car was standing over the pit on track "23½." This track "23½" was east of the two east chain posts, its west rail being about 36 inches, and the tourist car overhang about 7 inches from the two east chain supporting posts.[2] The floor of the "overhang" was about 51 inches above the ground, or 9 inches above the top of the posts, thus allowing an unobstructed clearance of 51 inches under the overhang. The "permanent board" was inside the chain enclosure, the board's east side being about 9½ inches from the two eastern chain posts. Despite the proximity of the tourist car to the posts there was sufficient space east of each chain post so that pit workers had access to and used the board as a walkway. One of the

---

[2] There was evidence that other types of cars had a wider overhang thereby reducing the space available for passage between the posts and the car. This evidence bore directly on the fact question as to the practice of employees generally in using the boardway as petitioner did here.

defendant's witnesses, a very large man weighing 250 pounds, passed through it, though according to his testimony, with "very bad discomfort." Petitioner was a much smaller man, weighing 145 pounds, and it was by passing between one of these posts and the tourist car that petitioner reached the "permanent board" which bridged the pit. Oil from wheels would sometimes accumulate at the bottom of the pit, and as stated by the Utah Supreme Court the "permanent board" was "almost certain to become greasy or oily" from use by the pit-men.

Neither before nor after the chains were put up had the railroad ever forbidden pit workers or any other workers to walk across the pit on the "permanent board." Neither written rules nor spoken instructions had forbidden any employees to use the board. And witnesses for both sides testified that pit workers were supposed to, and did, continue to use the board as a walkway after the chains and posts were installed. The Utah Supreme Court nevertheless held that erection of the chain and post enclosure was itself the equivalent of company orders that no employees other than pit workers should walk across the permanent board when the chains were up. And the Utah Supreme Court also concluded that there was insufficient evidence to authorize a jury finding that employees generally, as well as pit workers, had continued their long-standing and open practice of crossing the pit on the permanent board between the time the chains were put up and the time petitioner was injured.

It is the established rule that in passing upon whether there is sufficient evidence to submit an issue to the jury we need look only to the evidence and reasonable inferences which tend to support the case of a litigant against whom a peremptory instruction has been given. Viewing the evidence here in that way it was sufficient to show the following:

58

Switchmen and other employees, just as pit workers, continued to use the permanent board to walk across the pit after the chains were put up as they had used it before. Petitioner [3] and another wit-

---

[3] Petitioner testified in part as follows:

"Q. Mr. Wilkerson, I will ask you to state whether or not you have ever observed other switchmen or workmen working in the yards there in passing over that pit while cars were standing on $23\frac{1}{2}$ since the safety chains were up?

"A. Yes, sir, I have.

"Q. What has that practice been, the practice of crossing over the pit?

"A. Men that work around there, regardless of whether switchmen or car men that wanted to go that way went through there.

"Q. Went through—you mean over the pit?

"A. Over that pit, as I just described, from either side.

. . . . .

"Q. I will ask you to state whether or not you observed any practice with reference to crossing over the pit when men were working on the cars there in the daytime before these chains were installed?

"A. Walked right straight across the board.

"Q. Was there a board usually there to walk over?

"A. Yes, sir.

"Q. Was there any change in that practice after the chains were installed?

"A. None, only they had to walk around the chains.

. . . . .

"Q. What did you observe with reference to the number of times the occasions when men would cross over the pit.

"A. Oh, I couldn't say; I suppose maybe a hundred times; varies, men, both switchmen and car men or others working there in the yard necessary, pullman, employees and so forth.

"Q. Crossed over the pit?

"A. Yes, sir, it was a common practice for everybody to use that that way.

. . . . .

"Q. Did you ever see—did you ever notice the board ever being used for any other purpose except men walking across?

"A. No, sir, I haven't.

"Q. Ask you to state whether or not you experience any difficulty

ness[4] employed on work around the pit, testified positively that such practice continued. It is true that witnesses for the respondents testified that after the chains were put up, only the car men in removing and

in passing between the car and the post and onto the board and over the board and between the car and the north post at the time you passed it, the first time in the morning?

"A. No."

[4] Another witness testified in part as follows:

"Q. And what have you noticed with reference to the practice of men passing between the standing cars on 23½ and the posts that hold the safety chains?

"A. Well, they would walk through and get on the board and walk to and from each side, and the men that work on the pit work on that board, and sometimes set on the board next to the— in next to the car there to perform their work, you know, like where they are up under, or working on the car, they use the board over from it to work on.

.     .     .     .     .

"Q. What has been your practice in passing between cars that are standing on 23½ and the posts that hold the stakes and chains when they have been in place?

"A. When I have occasion to pass through there, I put my hand on the post, step over on the board, and go around the other post, and that is the way I pass to and from on the pit.

"Q. Have you observed other men passing over the pit under similar circumstances?

"A. Yes, sir, I have.

"Q. And what can you say with reference to the—such occurrences, as to how often they happen?

"A. O, I would judge that I saw the men pass through there dozens of times. . . .

.     .     .     .     .

"Q. Have you seen any other switchman working there in the yards act similarly; that is, go around the post, between the post and the car and pass over the board?

"A. Yes, sir, I have saw my helpers at different times and before the chains were placed, we used the board at all times, you know, just to cross the pit. I have walked across the pit a number of times that way, and also my helpers."

This witness later gave the names of two switchmen he had seen

applying wheels used the board "to walk from one side
of the pit to the other . . . ." Thus the conflict as to
continued use of the board as a walkway after erection of
the chains was whether the pit workers alone continued
to use it as a walkway, or whether employees generally
so used it. While this left only a very narrow conflict
in the evidence, it was for the jury, not the court, to
resolve the conflict.

It was only as a result of its inappropriate resolution of
this conflicting evidence that the State Supreme Court
affirmed the action of the trial court in directing the ver-
dict. Following its determination of fact, the Utah Su-
preme Court acted on the assumption that the respond-
ents "had no knowledge, actual or constructive, that
switchmen were using the plank to carry out their tasks,"
and the railroad had "no reason to suspect" that employees
generally would so use the walkway. From this, the
Court went on to say that respondents "were only required
to keep the board safe for the purposes of the pit crew-
men . . . and not for all the employees in the yard."
But the court emphasized that under different facts, main-
tenance of "a 22-inch board for a walkway, which is almost
certain to become greasy or oily, constitutes negligence."
And under the evidence in this case as to the board, grease
and oil, the court added: "It must be conceded that if
defendants knew or were charged with knowledge that
switchmen and other workmen generally in the yard were
habitually using the plank as a walkway in the manner
claimed by plaintiff, then the safety enclosure might be
entirely inadequate, and a jury question would have been
presented on the condition of the board and the adequacy
of the enclosure."

---

cross after chains were put up, but he did not thereby qualify his
testimony previously given as to the practice of employees generally
to use the walkway.

We agree with this last quoted statement of the Utah court, and since there was evidence to support a jury finding that employees generally had habitually used the board as a walkway, it was error for the trial judge to direct a verdict in favor of respondents.

There was, as the state court pointed out, evidence to show that petitioner could have taken a slightly longer route and walked around the pit, thus avoiding the use of the board. This fact, however, under the terms of the Federal Employers' Liability Act, would not completely immunize the respondents from liability if the injury was "in part" the result of respondents' negligence. For while petitioner's failure to use a safer method of crossing might be found by the jury to be contributory negligence, the Act provides that "contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee . . . ."

Much of respondents' argument here is devoted to the proposition that the Federal Act does not make the railroad an absolute insurer against personal injury damages suffered by its employees. That proposition is correct, since the Act imposes liability only for negligent injuries. *Cf. Coray* v. *Southern Pac. Co.*, 335 U. S. 520. But the issue of negligence is one for juries to determine according to their finding of whether an employer's conduct measures up to what a reasonable and prudent person would have done under the same circumstances. And a jury should hold a master "liable for injuries attributable to conditions under his control when they are not such as a reasonable man ought to maintain in the circumstances," bearing in mind that "the standard of care must be commensurate to the dangers of the business." *Tiller* v. *Atlantic C. L. R. Co.*, 318 U. S. 54, 67.

There are some who think that recent decisions of this Court which have required submission of negligence ques-

tions to a jury make, "for all practical purposes, a railroad an insurer of its employees." See individual opinion of Judge Major, *Griswold* v. *Gardner,* 155 F. 2d 333, 334. But see Judge Kerner's dissent from this view at p. 337 and Judge. Lindley's dissenting opinion, pp. 337–338. This assumption, that railroads are made insurers where the issue of negligence is left to the jury, is inadmissible. It rests on another assumption, this one unarticulated, that juries will invariably decide negligence questions against railroads. This is contrary to fact, as shown for illustration by other Federal Employers' Liability cases, *Barry* v. *Reading Co.,* 147 F. 2d 129, cert. denied, 324 U. S. 867; *Benton* v. *St. Louis-San Francisco R. Co.,* 182 S. W. 2d 61, cert. denied, 324 U. S. 843. And *cf. Bruner* v. *McCarthy,* 105 Utah 399, 142 P. 2d 649, cert. dismissed for reasons stated, 323 U. S. 673. Moreover, this Court stated some sixty years ago when considering the proper tribunal for determining questions of negligence: "We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others." *Jones* v. *East Tennessee R. Co.,* 128 U. S. 443, 445. And peremptory instructions should not be given in negligence cases "where the facts are in dispute, and the evidence in relation to them is that from which fair-minded men may draw different inferences." *Washington & G. R. Co.* v. *McDade,* 135 U. S. 554, 572. Such has ever since been the established rule for trial and appellate courts. See *Tiller* v. *Atlantic C. L. R. Co.,* 318 U. S. 54, 67, 68. Courts should not assume that in determining these questions of negligence juries will fall short of a fair performance of their constitutional function. In rejecting a contention that juries could be expected to determine certain disputed questions on whim, this Court, speaking

through Mr. Justice Holmes, said: "But it must be assumed that the constitutional tribunal does its duty and finds facts only because they are proved." *Aikens* v. *Wisconsin,* 195 U. S. 194, 206.

In reaching its conclusion as to negligence, a jury is frequently called upon to consider many separate strands of circumstances, and from these circumstances to draw its ultimate conclusion on the issue of negligence. Here there are many arguments that could have been presented to the jury in an effort to persuade it that the railroad's conduct was not negligent, and many counter arguments which might have persuaded the jury that the railroad was negligent. The same thing is true as to whether petitioner was guilty of contributory negligence. Many of such arguments were advanced by the Utah Supreme Court to support its finding that the petitioner was negligent and that the railroad was not.[5] But the arguments

---

[5] The state court argued that "other and safer routes were open" to the petitioner. But contributory negligence does not exempt a railroad from liability for its own negligence.

The state court also advanced the following argument: "In this particular case, the board appears adequate for the use of the pit crewmen, but entirely inadequate if intended to be a cross-walk for other employees. Employees climbing in and out of the pit approach more deliberately, use other and different hand holds, and are more careful of their footing, while employees swinging on to the plank in a hurry are apt to forget about the slippery condition of an oily board and forget about the dangers incident to crossing, as did the plaintiff, who swung himself around the chain post and onto the plank." Aside from the apparent absence of direct evidence that pit crewmen would exercise greater care to protect themselves than would other employees, whether they would or not is patently a jury question.

The state court also said: "Had they not intended to preclude the use of the board as a walk-way, the defendants would not have installed the chain posts so as to block an open straight approach to the board." This argument of the state court ignores the absence

made by the State Supreme Court are relevant and appropriate only for consideration by the jury, the tribunal selected to pass on the issues. For these reasons, the trial court should have submitted the case to the jury, and it was error for the Utah Supreme Court to affirm its action in taking the case from the jury.

It is urged by petitioner that other fact issues should have been submitted to the jury in addition to those we have specifically pointed out. We need not consider these contentions now since they may not arise on another trial of the case.

The judgment of the Supreme Court of Utah is reversed and the cause is remanded for further action not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE FRANKFURTER, concurring.

Trial by jury as guaranteed by the Constitution of the United States and by the several States presupposes a jury under proper guidance of a disinterested and competent trial judge. *Herron* v. *Southern Pacific Co.*, 283 U. S. 91. It is an important element of trial by jury which puts upon the judge the exacting duty of determining whether there is solid evidence on which a jury's

---

of any direct evidence to show that the chains were erected to keep people from walking over the old "permanent board" walkway. Petitioner testified that it was his understanding that the chains were erected "to keep people from walking directly into the open pit."

Another argument of the State Supreme Court was: "Also, a sign not to cross would have afforded plaintiff no additional security or warning, for he disregarded the chain and he would no doubt have ignored another form of warning." If such an inference was justifiable and was relevant at all on the question of railroad negligence, it was an inference to be drawn from facts by the jury, not by the court.

verdict could be fairly based. When a plaintiff claims that an injury which he has suffered is attributable to a defendant's negligence—want of care in the discharge of a duty which the defendant owed to him—it is the trial judge's function to determine whether the evidence in its entirety would rationally support a verdict for the plaintiff, assuming that the jury took, as it would be entitled to take, a view of the evidence most favorable to the plaintiff. If there were a bright line dividing negligence from non-negligence, there would be no problem. Only an incompetent or a wilful judge would take a case from the jury when the issue should be left to the jury. But since questions of negligence are questions of degree, often very nice differences of degree, judges of competence and conscience have in the past, and will in the future, disagree as to whether proof in a case is sufficient to demand submission to the jury. The fact that a third court thinks there was enough to leave the case to the jury does not indicate that the other two courts were unmindful of the jury's function. The easy but timid way out for a trial judge is to leave all cases tried to a jury for jury determination, but in so doing he fails in his duty to take a case from the jury when the evidence would not warrant a verdict by it. A timid judge, like a biased judge, is intrinsically a lawless judge.

These observations are especially pertinent to suits under the Federal Employers' Liability Act. The difficulties in these cases derive largely from the outmoded concept of "negligence" as a working principle for the adjustments of injuries inevitable under the technological circumstances of modern industry. This cruel and wasteful mode of dealing with industrial injuries has long been displaced in industry generally by the insurance principle that underlies workmen's compensation laws. For reasons that hardly reflect due regard for the interests

of railroad employees, "negligence" remains the basis of liability for injuries to them. It is, of course, the duty of courts to enforce the Federal Employers' Liability Act, however outmoded and unjust in operation it may be. But so long as negligence rather than workmen's compensation is the basis of recovery, just so long will suits under the Federal Employers' Liability Act lead to conflicting opinions about "fault" and "proximate cause." The law reports are full of unedifying proof of these conflicting views, and that too by judges who seek conscientiously to perform their duty by neither leaving everything to a jury nor, on the other hand, turning the Federal Employers' Liability Act into a workmen's compensation law.

Considering the volume and complexity of the cases which obviously call for decision by this Court, and considering the time and thought that the proper disposition of such cases demands, I do not think we should take cases merely to review facts already canvassed by two and sometimes three courts even though those facts may have been erroneously appraised. The division in this Court would seem to demonstrate beyond peradventure that nothing is involved in this case except the drawing of allowable inferences from a necessarily unique set of circumstances. For this Court to take a case which turns merely on such an appraisal of evidence, however much hardship in the fallible application of an archaic system of compensation for injuries to railroad employees may touch our private sympathy, is to deny due regard to the considerations which led the Court to ask and Congress to give the power to control the Court's docket. Such power carries with it the responsibility of granting review only in cases that demand adjudication on the basis of importance to the operation of our federal system; importance of the outcome merely to the parties is

not enough. It has been our practice to dismiss a writ of certiorari even after it was granted where argument exposed a want of conflict or revealed that the case involved no more than its particular facts.[1] I believe we should adhere to this practice in the present case.

But the importance of adhering to this practice cannot be seen in the perspective of a single case. Despite the mounting burden of the Court's business, this is the thirtieth occasion in which a petition for certiorari has been granted during the past decade to review a judgment denying recovery under the Federal Employers' Liability Act in a case turning solely on jury issues. The only petition on behalf of a carrier that brought such a case here during this period was dismissed, and rightly, as improvidently granted. *McCarthy* v. *Bruner*, 322 U. S. 718; 323 U. S. 673. Nor does what the United States Reports disclose regarding the disposition of petitions for certiorari tell the whole story of the Court's exercise of discretion in granting or denying them. This is so because of adherence, on the whole, to the wise practice of not publicly recording the vote of the Justices. Of course, some light on the situation is derivatively shed by the disclosed position of the Justices on the merits of the cases. But the unavailable data are, as can readily

---

[1] The reasons for this practice were indicated by Chief Justice Taft for a unanimous Court in *Layne & Bowler Corp.* v. *Western Well Works,* 261 U. S. 387, 393:

"If it be suggested that as much effort and time as we have given to the consideration of the alleged conflict would have enabled us to dispose of the case before us on the merits, the answer is that it is very important that we be consistent in not granting the writ of certiorari except in cases involving principles the settlement of which is of importance to the public as distinguished from that of the parties, and in cases where there is a real and embarrassing conflict of opinion and authority between the circuit courts of appeal. The present case certainly comes under neither head."

be imagined, especially relevant in the case of such a recurring problem as granting or denying certiorari under a particular statute.

I would, therefore, dismiss the petition as having been improvidently granted. Since, however, that is not to be done, I too have been obliged to recanvass the record and likewise think that there was here enough evidence to go to the jury.

MR. JUSTICE BURTON, having concurred in the Court's opinion, also joins in this opinion.

MR. JUSTICE DOUGLAS, concurring.

While I join in the opinion of the Court, I think it appropriate to take this occasion to account for our stewardship in this group of cases.

The Federal Employers' Liability Act was designed to put on the railroad industry some of the cost for the legs, eyes, arms, and lives which it consumed in its operations. Not all these costs were imposed, for the Act did not make the employer an insurer. The liability which it imposed was the liability for negligence. But judges had created numerous defenses—fellow-servant rule, assumption of risk, contributory negligence—so that the employer was often effectively insulated from liability even though it was responsible for maintenance of unsafe conditions of work. The purpose of the Act was to change that strict rule of liability, to lift from employees the "prodigious burden" of personal injuries which that system had placed upon them, and to relieve men "who by the exigencies and necessities of life are bound to labor" from the risks and hazards that could be avoided or lessened "by the exercise of proper care on the part of the employer in providing safe and proper machinery and equipment with which the employee does his work." [1]

[1] H. R. Rep. No. 1386, 60th Cong., 1st Sess. 2 (1908).

That purpose was not given a friendly reception in the courts. In the first place, a great maze of restrictive interpretations were engrafted on the Act, constructions that deprived the beneficiaries of many of the intended benefits of the legislation. See *Seaboard Air Line* v. *Horton,* 233 U. S. 492; *Toledo, St. L. & W. R. Co.* v. *Allen,* 276 U. S. 165; and the review of the cases in *Tiller* v. *Atlantic Coast Line R. Co.,* 318 U. S. 54, 62–67. In the second place, doubtful questions of fact were taken from the jury and resolved by the courts in favor of the employer. This Court led the way in overturning jury verdicts rendered for employees. See *Chicago, M. & St. P. R. Co.* v. *Coogan,* 271 U. S. 472; *Missouri Pac. R. Co.* v. *Aeby,* 275 U. S. 426; *New York Central R. Co.* v. *Ambrose,* 280 U. S. 486. And so it was that a goodly portion of the relief which Congress had provided employees was withheld from them.

The first of these obstacles which the courts had created could be removed by Congress. In 1939 Congress did indeed move to release the employees from the burden of assumption of risk which the Court had reimposed on them. 53 Stat. 1404, 45 U. S. C. § 54; *Tiller* v. *Atlantic Coast Line R. Co., supra.* The second evil was not so readily susceptible of Congressional correction under a system where liability is bottomed on negligence. Since the condition was one created by the Court and beyond effective control by Congress, it was appropriate and fitting that the Court correct it. In fact, a decision not to correct it was to let the administration of this law be governed not by the aim of the legislation to safeguard employees but by a hostile philosophy that permeated its interpretation.

The basis of liability under the Act is and remains negligence. Judges will not always agree as to what facts are necessary to establish negligence. We are not in agreement in all cases. But the review of the cases com-

ing to the Court from the 1943 Term to date [2] and set forth in the Appendix to this opinion shows, I think, a record more faithful to the design of the Act than previously prevailed.

Of the 55 petitions for certiorari filed during this period, 20 have been granted. Of these one was granted at the instance of the employer, 19 at the instance of an employee. In 16 of these cases the lower court was reversed for setting aside a jury verdict for an employee or taking the case from the jury. In 3 the lower court was sustained in taking the case from the jury. In the one case granted at the instance of the employer we held that it had received the jury trial on contributory negligence to which it was entitled. In these 20 cases we were unanimous in 10 of the decisions which we rendered on the merits.

Of the 35 petitions denied, 21 were by employers claiming that jury verdicts were erroneous or that new trials should not have been ordered. The remaining 14 were filed by employees. In 10 of these the lower court had withheld the case from the jury and rendered judgment for the employer, in 3 it had sustained jury verdicts for the employer, and in 1 reversed a jury verdict for the employee and directed a new trial.

From this group of cases three observations can be made:

(1) The basis of liability has not been shifted from negligence to absolute liability.

(2) The criterion governing the exercise of our discretion in granting or denying certiorari is not who loses

---

[2] Cases where petitions for certiorari were granted this Term but which have not yet been decided on the merits have not been included. Nor have cases been included which though arising under the Act present issues other than those of negligence. Moreover, *Wabash R. Co.* v. *Williamson,* certiorari denied, 330 U. S. 824, has been omitted since negligence was admitted by the employer, the case turning on the construction of a railroad rule.

below but whether the jury function in passing on disputed questions of fact and in drawing inferences from proven facts has been respected.

(3) The historic role of the jury in performing that function, see *Jones* v. *East Tennessee, V. & G. R. Co.,* 128 U. S. 443, 445; *Washington & G. R. Co.* v. *McDade,* 135 U. S. 554, 572; *Bailey* v. *Central Vermont R. Co.,* 319 U. S. 350, 353–354, is being restored in this important class of cases.

MR. JUSTICE MURPHY and MR. JUSTICE RUTLEDGE join in this opinion.

APPENDIX TO OPINION OF DOUGLAS, J.

I. Cases in which certiorari was granted:

A. Where lower court which took the case from the jury or set aside a jury verdict for an employee was reversed:

*Tennant* v. *Peoria & P. U. R. Co.,* 321 U. S. 29.

*Tiller* v. *Atlantic Coast Line,* 323 U. S. 574.

*Blair* v. *B. & O. R. Co.,* 323 U. S. 600.

*Keeton* v. *Thompson,* 326 U. S. 689.

*Lavender* v. *Kurn,* 327 U. S. 645.

*Cogswell* v. *Chicago & E. Ill. R. Co.,* 328 U. S. 820.

*Jesionowski* v. *Boston & M. R. Co.,* 329 U. S. 452.

*Ellis* v. *Union P. R. Co.,* 329 U. S. 649.

*Pauly* v. *McCarthy,* 330 U. S. 802.

*Myers* v. *Reading Co.,* 331 U. S. 477 (Safety Appliance Act).

*Lillie* v. *Thompson,* 332 U. S. 459.

*Anderson* v. *Atchison, T. & S. F. R. Co.,* 333 U. S. 821.

*Eubanks* v. *Thompson,* 334 U. S. 854.

*Penn* v. *Chicago & N. W. R. Co.,* 335 U. S. 849.

*Coray* v. *Southern Pacific Co.,* 335 U. S. 520.

*Wilkerson* v. *McCarthy,* 336 U. S. 53.

72

I. Cases in which certiorari was granted—Continued.
  B. Where lower court which set aside a jury verdict for an employee or rendered judgment for the employer on questions of law was sustained:
  *Brady* v. *Southern R. Co.*, 320 U. S. 476.
  *Hunter* v. *Texas Electric R. Co.*, 332 U. S. 827.
  *Eckenrode* v. *Penn. R. Co.*, 335 U. S. 329.

  C. Where lower court which upheld the jury's verdict on the issues of negligence and contributory negligence was sustained:
  *McCarthy* v. *Bruner*, 323 U. S. 673.

II. Cases in which certiorari was denied:
  A. Where lower court withheld case from jury and rendered judgment for the employer:
  *Beamer* v. *Virginian R. Co.*, 321 U. S. 763.
  *Cowdrick* v. *Penn. R. Co*, 323 U. S. 799.
  *Negro* v. *Boston & Maine R.*, 324 U. S. 862.
  *Fantini* v. *Reading Co.*, 325 U. S. 856.
  *Scarborough* v. *Pennsylvania R. Co.*, 326 U. S. 755.
  *Chisholm* v. *Reading Co.*, 329 U. S. 807.
  *Waller* v. *Northern P. T. Co.*, 329 U. S. 742.
  *Wolfe* v. *Henwood*, 332 U. S. 773.
  *Lasagna* v. *McCarthy*, 332 U. S. 829.
  *Trust Co. of Chicago* v. *Erie R. Co.*, 334 U. S. 845.

  B. Where lower court sustained a jury verdict for the employer:
  *Barry* v. *Reading Co.*, 324 U. S. 867.
  *Benton* v. *St. Louis-S. F. R. Co.*, 324 U. S. 843.
  *Benson* v. *Missouri-Kansas-Texas R. Co.*, 332 U. S. 830.

  C. Where lower court reversed a jury verdict for the employee and directed a new trial:
  *Owens* v. *Union P. R. Co.*, 323 U. S. 740.

II. Cases in which certiorari was denied—Continued.

    D. Where lower court sustained jury verdict for the employee or held that the employee's case should have gone to the jury:

*Southern Pacific Co.* v. *Jester,* 323 U. S. 716.

*Thompson* v. *Godsy,* 323 U. S. 719.

*Northern P. R. Co.* v. *Bimberg,* 323 U. S. 752.

*Terminal R. Assn.* v. *Copeland,* 323 U. S. 799.

*Chicago & E. Ill. R. Co.* v. *Waddell,* 323 U. S. 732.

*Boston & M. R.* v. *Cabana,* 325 U. S. 873.

*Texas & P. R. Co.* v. *Riley,* 325 U. S. 873.

*Terminal R. Assn.* v. *Mooney,* 326 U. S. 723.

*Terminal R. Assn.* v. *Schorb,* 326 U. S. 786.

*Baltimore & O. C. T. R. Co.* v. *Howard,* 328 U. S. 867.

*Gardner* v. *Griswold,* 329 U. S. 725.

*Henwood* v. *Chaney,* 329 U. S. 760.

*Boston & Maine R.* v. *Meech,* 329 U. S. 763.

*Wheeling & L. E. R. Co.* v. *Keith,* 332 U. S. 763.

*Delaware, Lackawanna & W. R. Co.* v. *Mostyn,* 332 U. S. 770.

*Atlantic Coast Line* v. *Meeks,* 333 U. S. 827.

*Wabash R. Co.* v. *Hampton,* 333 U. S. 833.

*Fleming* v. *Husted,* 333 U. S. 843.

*Unity R. Co.* v. *Kurimsky,* 333 U. S. 855.

*Baltimore & O. R. Co.* v. *Skidmore,* 335 U. S. 816.

    E. Where lower court set aside a jury verdict for the employer because of erroneous instructions and ordered a new trial:

*Pennsylvania R. Co.* v. *McCarthy,* 329 U. S. 812.

MR. CHIEF JUSTICE VINSON, dissenting.

In my view of the record, there is no evidence, nor any inference which reasonably may be drawn from the evidence when viewed in the light most favorable to the

petitioner, which could sustain a verdict for him. This leads me to conclude that the trial court properly directed a verdict for the respondents, and I would affirm.

MR. JUSTICE JACKSON, dissenting.

The trial court, after hearing all the evidence and seeing the witnesses, directed a verdict of no cause of action. The Utah Supreme Court, in a careful opinion, decided two propositions: First, whether this Court still holds that a plaintiff "in order to recover must still show negligence on the part of the employer." It resolved its doubts by relying upon statements of this Court to the effect that it still does adhere to that requirement.[1] Second, whether there is any evidence of negligence. On

---

[1] The Supreme Court of Utah considered and rejected the opinion in *Griswold* v. *Gardner*, 155 F. 2d 333, in which it was said:

"Any detailed review of the evidence in a case of this character for the purpose of determining the propriety of the trial court's refusal to direct a verdict would be an idle and useless ceremony in the light of the recent decisions of the Supreme Court. This is so regardless of what we might think of the sufficiency of the evidence in this respect. The fact is, so we think, that the Supreme Court has in effect converted this negligence statute into a compensation law thereby making, for all practical purposes, a railroad an insurer of its employees. (See dissent of Mr. Justice Roberts in Bailey v. Central Vermont Ry., 319 U. S. 350, 358, 63 S. Ct. 1062, 1066, 87 L. Ed. 1444.)

"The Supreme Court, commencing with Tiller v. Atlantic Coastline R. Co., 318 U. S. 54, 63 S. Ct. 444, 87 L. Ed. 610, 143 A. L. R. 967, in a succession of cases has reversed every court (with one exception hereinafter noted) which has held that a defendant was entitled to a directed verdict. In the Tiller case, the Supreme Court reversed the Court of Appeals for the Fourth Circuit, 128 F. 2d 420, which had affirmed the District Court in directing a verdict. The case, upon remand, was again tried in the court below, where a directed verdict was denied. For this denial the Court of Appeals reversed and again the Supreme Court reversed the Court of Appeals,

a careful analysis, it found no evidence whatever of negligence in this case. Following established principles of law, it concluded that it would have been error to let such a case go to the jury, and therefore affirmed the trial court's refusal so to do.

This Court now reverses and, to my mind at least, espouses the doctrine that any time a trial or appellate court weighs evidence or examines facts it is usurping the jury's function. But under that rule every claim of injury would require jury trial, even if the evidence showed no possible basis for a finding of negligence. Determination of whether there could be such a basis is a function of the trial court, even though it involves weighing evidence and examining facts. I think we are under a duty to examine the record impartially if we take such cases and to sustain the lower courts where,

---

holding that the District Court properly submitted the case to the jury. In Tennant v. Peoria & P. U. R. Co., 321 U. S. 29, 64 S. Ct. 409, 88 L. Ed. 520, this court reversed the District Court on account of its refusal to direct a verdict, and our decision, 134 F. 2d 860, was reversed by the Supreme Court. In Bailey v. Central Vermont Ry., 319 U. S. 350, 63 S. Ct. 1062, 87 L. Ed. 1444, the Supreme Court of Vermont held that there should have been a directed verdict for the defendant, and the Supreme Court reversed the decision of that court. In Blair v. Baltimore & O. R. Co., 323 U. S. 600, 65 S. Ct. 545, 89 L. Ed. 490, the Supreme Court reversed the Supreme Court of Pennsylvania which had held that there should have been a directed verdict. In the recent case of Lavender, Administrator, etc., v. Kurn et al., [327 U. S. 645] 66 S. Ct. 740, the Supreme Court reversed the Supreme Court of Missouri which had held that there should have been a directed verdict for each of the defendants.

"The only exception to this unbroken line of decisions is Brady v. Southern R. Co., 320 U. S. 476, 64 S. Ct. 232, 88 L. Ed. 239, where the Supreme Court of North Carolina was affirmed in its holding that there should have been a directed verdict. This exception, however, is of little consequence in view of the fact that four members of the court dissented."

76

as here, a finding of negligence would obviously be without basis in fact.

I am not unaware that even in this opinion the Court continues to pay lip service to the doctrine that liability in these cases is to be based only upon fault. But its standard of fault is such in this case as to indicate that the principle is without much practical meaning.

This record shows that both the wheel pit into which plaintiff fell and the board on which he was trying to cross over the pit were blocked off by safety chains strung between posts. Plaintiff admits he knew the chains were there to keep him from crossing over the pit and to require him to go a few feet farther to walk around it. After the chains were put up, any person undertaking to use the board as a cross walk had to complete involved contortions and gymnastics, particularly when, as was the case with petitioner, a car was on the track 23½. A casual examination of the model filed as an exhibit in this Court shows how difficult was such a passage. Nevertheless, the Court holds that if employees succeeded in disregarding the chains and forced passage frequently enough to be considered "customary," and the railroad took no further action, its failure so to do was negligence. The same rule would no doubt apply if the railroad's precautions had consisted of a barricade, or an armed guard. I think the railroad here could not fairly be found guilty of negligence and that there was no jury question.

If in this class of cases, which forms a growing proportion of its total, this Court really is applying accepted principles of an old body of liability law in which lower courts are generally experienced, I do not see why they are so baffled and confused at what goes on here. On the other hand, if this Court considers a reform of this law appropriate and within the judicial power to promulgate, I do not see why it should constantly deny that it is doing just that.

I think a comparison of the State Supreme Court's opinion, —— Utah ——, 187 P. 2d 188, with the opinion of this Court will fairly raise, in the minds of courts below and of the profession, the question I leave to their perspicacity to answer: In which proposition did the Supreme Court of Utah really err?