Darlene F. FOLLESE (nee Hall), Relator,

v.

EASTERN AIRLINES, et al., Respondents,

Employers Mutual Liability Insurance Company of Wausau, et al., Respondents,

County of Hennepin, Intervenor.

Nos. 47532 and 47552.

Supreme Court of Minnesota.

Oct. 20, 1978.

LeVander, Zimpfer, Buegler & Zotaley, Minneapolis, for relator.

Jardine, Logan & O'Brien and Charles E. Gillin and Alan R. Vanasek, St. Paul, for respondents Eastern Airlines, et al.

Ochs, Larsen, Klimek & Olson and Joseph T. Herbulock, Minneapolis, for respondent Employers Mut. Liability Ins. Co.

Gary W. Flakne, County Atty., Arthur W. Katzman, Asst. County Atty., Minneapolis, for County of Hennepin.

Heard before ROGOSHESKE, KELLY, and TODD, JJ., and considered and decided by the court en banc.

ROGOSHESKE, Justice.

The principal question raised on this certiorari review of a decision of the Workers' Compensation Court of Appeals denying subject matter jurisdiction of an employee's claim petition is whether Minnesota has a sufficient governmental interest in the employment relationship of the employer and employee and her out-of-state work-related injuries prior to 1967 to justify application of our workers' compensation statutes in adjudicating the merits of her claims for medical and disability compensation benefits. We hold on the facts peculiar to this case that there exists a sufficient legitimate governmental interest with respect to the localization of the employer's business as a qualified insured, the employee's receipt of public welfare payments, her domicile and nature of her out-of-state residence, the hazard of her being without a remedy, and the nature of her employment relationship, to hear and decide employee's

pre-1967 claims under this state's workers' compensation laws. We therefore reverse the court of appeals and remand for trial.

These proceedings were instituted by a claim petition filed by Darlene Follese for compensation benefits arising out of four separate work-related injuries sustained outside of Minnesota during the course of her 8 years of employment as a stewardess with Eastern Airlines, whose home office is Miami, Florida. Employee, then Darlene Hall, age 20, began her employment relationship with Eastern in 1962. Her claims, all of which arose while she was stationed in Miami, may be summarized as follows.

Her first injury, a head injury, occurred in New York's Idlewild Airport on May 20, 1964. After landing, the plane was taxiing to the terminal when the pilot was compelled to brake suddenly to avoid striking a smaller aircraft. Employee was thrown headlong into a closet in the back of the passenger cabin.

Her second injury occurred July 8, 1965, on a flight originating in Minneapolis-St. Paul and bound for Miami with intermittent stops. While descending over Cincinnati, Ohio, or over Tampa, Florida, the aircraft encountered turbulence and she was thrown about the passenger cabin, injuring her back.

Her third and fourth injuries were back injuries occurring December 17, 1966, and July 5, 1968. Both resulted from air turbulence encountered while airborne over Texas in flights originating in Miami bound for Dallas. The record does not reveal whether her third and fourth back injuries were aggravations of her first back injury. At oral argument, counsel stated there was no causal relation between her head injury and back injuries.

Following each of these four injuries, employee received medical treatment by medical personnel at Eastern Airline's medical clinic in Miami and for short periods of time in various Miami hospitals. For each of these injuries, Florida-incurred medical expenses were voluntarily paid by Eastern's insurers.[1] Although employee reported these injuries to employer, she at no time personally filed any claims for benefits with the Florida Workmen's Compensation Commission.

She testified that in May 1969 she began to experience blackouts, which, because of their increasing frequency, ultimately required her to resign her employment with Eastern in August 1970. She returned to Minnesota, married Mr. Follese, a Minnesota resident, and has since resided in this state. Following her termination of employment and return to Minnesota and beginning in June 1970, she has been treated and hospitalized eight times in Minnesota for blackouts and seizures and an addiction to pain killing medicines earlier prescribed for treatment of severe headaches, blackouts, and seizures.[2]

As indicated by her initial claim petition filed in March 1974, her principal claim is for temporary total and permanent partial disability benefits and medical expenses resulting from her 1964 head injury. Her explanation for the delay in filing her petition is that it was not until December 1973, when she was advised by her doctors that her blackouts and seizures—diagnosed as

1. The records show that the Employers Mutual Liability Insurance Company of Wausau, Eastern's insurer at the time of the 1966 and 1968 back injuries, paid medical expenses of $595.20 and $914.75, respectively. The parties stipulate that Fidelity and Casualty Insurance Company, Eastern's insurer at the time of the 1964 head injury and the 1965 back injury, also made some payments of medical expenses, but all records of the insurer, Eastern, and Florida Workmen's Compensation Commission have been destroyed.

2. Hennepin County Welfare Department was permitted to intervene to seek reimbursement of money paid for employee's medical, hospital, and maintenance expenses. Employer's offer of proof during trial was that from October 1, 1972, through September 1, 1973, the welfare department paid $8,732.69 for employee's hospital and medical expenses and $2,518.97 for her maintenance. It was asserted at oral argument that these payments were received during a period when she and her husband were temporarily separated. The offer of proof was rejected by the compensation judge as irrelevant to the issue of subject matter jurisdiction.

traumatic epilepsy—were causally related to the 1964 head injury, that she retained counsel to institute these proceedings. Discovery proceedings prompted an amendment to her claim petition in March 1975 to include claims for benefits for the three injuries to her back. She further asserts that any further recovery of benefits in Florida is barred by that state's statute of limitations, and that Minnesota remains the only forum in which the merits of her claim can be adjudicated. This assertion is neither conceded nor denied by employer's insurers.[3]

Upon request of the parties, the compensation judge consented to hear the limited issue of whether Minnesota should assume subject matter jurisdiction over employee's claims. The judge found upon the evidence submitted that employee was hired on October 12, 1962, pursuant to a "Florida contract of hire" and that Minnesota does not have jurisdiction to hear and decide the merits of employee's claim except as to her first back injury in 1965, which occurred on a flight originating in this state and referable to Eastern's business localized in Minnesota. The Workers' Compensation Court of Appeals, one judge dissenting, observing that it is "a close question as to where the contract of employment was completed," adopted the compensation judge's findings and decision. The dissent would deny jurisdiction as to employee's entire claim on the ground that Florida is the proper jurisdiction to determine those claims. Both employee and employer-insurers appeal.

We are mindful that conflict of law problems concerning extraterritorial application of a state's compensation laws in cases of out-of-state work-related injuries in industries that, like the airlines, operate interstate and nationwide arise because of the lack of uniformity of state laws and because Congress, except for the railroad industry, has not seen fit to occupy this field of law. Thus, state laws offer the only relief available to an employee injured outside of his residence or domicile.[4] It has, however, long been established in this state and in most jurisdictions that a state may, consistent with the requirement of due process and the full faith and credit clauses of the Federal constitution, apply its compensation statutes to afford relief to an employee injured outside its state even though the compensation statutes of a sister state are also applicable. *Cook v. Minneapolis Bridge Construction Co.,* 231 Minn. 433, 43 N.W.2d 792 (1950); Restatement, Conflict of Laws 2d, §§ 181, 182; 4 Larson, Workmen's Compensation, §§ 85.00, 85.40. Even though Florida's exercise of jurisdiction pursuant to Fla.Stat. § 440.09(1) appears to be authorized in this case,[5] Minnesota may constitutionally assume jurisdiction since the evidence amply establishes that the minimal requirements of full faith and credit and due process clauses are satisfied by this state's more than casual interest in employee's claims. *Alaska Packers Ass'n v. Industrial Accident Comm.,* 294

3. Employee, at the time of hearing before the compensation judge, acknowledged that files of claims for her injuries had been reestablished before the Florida Workmen's Compensation Commission. Her offer to prove that Florida counsel advised in writing that any further recovery is barred by the Florida statute of limitations and dismissal was contemplated was ruled immaterial by the compensation judge. Fla.Stat. § 440.19(1)(a) provides: "The right to compensation for disability under this chapter shall be barred unless a claim therefor is filed within two (2) years after the time of injury, except that if payment of compensation has been made or remedial treatment has been furnished by the employer without an award on account of such injury a claim may be filed within two (2) years after the date of the last payment of compensation or after the date of

the last remedial treatment furnished by the employer." The last payments by Eastern's insurers relating to any of employee's injuries were apparently made in 1968 or 1969. The Florida commission was first renotified of her current claims in 1974.

4. 4 Larson, Workmen's Compensation, §§ 84.-10, note 1.2, and 91.10, note 36. See, also, dissenting and concurring opinions of Mr. Justice Frankfurter in *Wilkerson v. McCarthy,* 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949), and *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).

5. See, also, *Hall v. Hughes,* 286 So.2d 568 (Fla. 1973).

U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044 (1935); *Cardillo v. Liberty Mutual Ins. Co.,* 330 U.S. 469, 67 S.Ct. 801, 91 L.Ed. 1028 (1947). Consistent with constitutional standards, among the factors, theories, or tests, singly or in combination, which are most commonly applied to justify application of a state's compensation act to a given injury are the place of injury, the place of making the contract, the principal location of employment, the place where the employer's business is localized, and the place where the employee resides.[6] It is also a settled rule that an award or settlement proceeding instituted in one state does not bar such proceeding or a successive award in another state, deducting an award or settlement received in the first proceeding from the second. *Cook v. Minneapolis Bridge Construction Co., supra; Houle v. Stearns-Rogers Mfg. Co.,* 279 Minn. 345, 157 N.W.2d 362 (1968).[7] It follows that a prior voluntary acceptance of compensation or payments made at the request of the employer under the laws of one state does not preclude the employee from pursuing his statutory right to an award in another state. 4 Larson, Workmen's Compensation, § 85.50, pp. 16–27.

■ Our approach to the problem presented therefore is not whether Minnesota has jurisdiction to the exclusion of Florida or whether our state's interest or contacts are greater or more significant than are Florida's or those of any other state having an interest measured by conventional choice-of-law tests employed in cases such as *Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408 (1977). Rather, our inquiry must be directed at an appraisal of our legitimate interest to determine the range of extraterritorial application which may justifiably be given to our compensation act under the special facts of this case, giving due regard to the rights and welfare of the employee and the reciprocal obligations and immunities of the employer. The range of application cannot be arbitrary or unreasonable and must be governed by the authority granted or limitations imposed by provisions of our compensation act and our prior decisions in effect at the time of each of employee's injuries. *Boltz v. Armour Agricultural Chemical Co.,* 269 Minn. 482, 486, 131 N.W.2d 624, 627 (1964); *Knopp v. Gutterman,* 258 Minn. 33, 36, 102 N.W.2d 689, 693 (1960).

■ At the time of employee's 1964, 1965, and 1966 injuries and until 1967, Minnesota had neither statutes authorizing nor limiting extraterritorial application of our act to out-of-state injuries. In *State ex rel. Chambers v. District Court,* 139 Minn. 205, 166 N.W. 185 (1918), however, we promulgated the so-called "business localization" test under which jurisdiction over such injuries could be assumed. Under this test, an employee is afforded relief for out-of-state injuries under our compensation act upon proof that the employer's business was localized in Minnesota and that the employee's services at the time of injury were referable to that localized business. As developed over the years, this test controlled extraterritorial application of our laws to such injuries even though the contract of employment was not entered into in Minnesota, *Marrier v. National Painting Corp.,* 249 Minn. 382, 82 N.W.2d 356 (1957), and even though at the time of injury the employee was a nonresident, *Aleckson v. Kennedy Motor Sales Co.,* 238 Minn. 110, 55 N.W.2d 696 (1952). Consistent with the purpose of compensation acts, the rationale of the test is that an employer who carries on substantial business in this state should be expected and required to insure against the risk and burden of payment of an employee's work-related injury, wherever it occurs, as part of the employer's localized business expense. While other jurisdictions, in determining whether their local act should apply, have included these localization factors with varying degrees of signifi-

---

**6.** See, Restatement, Conflict of Laws 2d, § 181; 4 Larson, Workmen's Compensation, §§ 86.10, 86.34, 87.50.

**7.** Restatement, Conflict of Laws 2d, § 182.

cance in conjunction with other factors,[8] we steadfastly required the business localization test to be met as essential to accepting jurisdiction until *Houle v. Stearns-Rogers Mfg. Co.*, 279 Minn. 345, 157 N.W.2d 362 (1968). There, the employee, a resident of Minnesota, was hired by a Colorado employer through a union office in Minnesota to work on a construction project in South Dakota. He was injured at the jobsite and awarded compensation benefits in South Dakota. He subsequently sought additional benefits under our statutes. Acknowledging that under the localization test jurisdiction could not be assumed, we considered whether jurisdictional factors other than localization of business would justify affording relief under our statutes. Noting that the place of making the contract is generally regarded as a legitimate state interest justifying application of its laws, we took pains to demonstrate that the compensation court's finding that the contract was made in Minnesota had adequate evidentiary support.

■ Although we acknowledged that other jurisdictions and the scholarly literature urged that because a compensation act may properly be regarded as a part of an employment contract a sufficient state interest can arise on the sole ground that the contract of employment is made in the forum state, we did not base our decision on that factor alone. Rather, we held that under the circumstances disclosed, where Minnesota was the state of the employee's residence, the state where the contract of employment was made, where the nature of the employer's business in South Dakota was transitory, where the employee was temporarily working in that state receiving in addition to salary travel and subsistence allowances, and where the employer had qualified as an insured employer in Minnesota and maintained an agent here, a sufficient legitimate governmental interest existed in this state to justify jurisdiction of the employee's claim. There can be no doubt that *Houle* expanded the range of extraterritorial application of our compensation statutes. Contrary to employee's argument, however, we did not abolish the localization-of-business test. Our decision specifically acknowledged that test as resting on "ample authority," and a week following that decision we applied the test in *Hagberg v. Colonial & Pacific Frigidways, Inc.*, 279 Minn. 396, 157 N.W.2d 33 (1968). What emerges from *Houle* is that where business localization cannot be shown the place of contract alone will not be sufficient to establish jurisdiction unless it can be determined by an appraisal of the facts of each case that a legitimate governmental interest exists in this state to justify extraterritorial application. Viewed as a limitation on subject matter jurisdiction applicable to cases arising prior to 1967,[9] this supplemental legitimate-interest test is clearly consistent with, if not more restrictive than, constitutional due process requirements and therefore affords full faith and credit to the laws of other states, including those of Florida.

We are persuaded that the facts peculiar to this case establish a significant governmental interest to justify extraterritorial application of our laws to adjudicate employee's claims arising out of her pre-1967 work-related injuries. Employee, as a lifelong resident of this state except for the 8-year period when she was necessarily required to reside elsewhere during her employment with Eastern, was born, reared, educated, employed, and married in Minnesota. When she was 20 years old on October 8, 1962, she responded to a newspaper advertisement to interview for an airline stewardess position with an agent of Eastern in Minneapolis. She testified that following her interview, which included a request to show "[her] legs because at that time the skirts were pretty long," Eastern's

---

8. See, Dwan, *Workmen's Compensation and the Conflict of Laws—the Restatement and Other Recent Developments*, 20 Minn.L.Rev. 19, 27; 4 Larson, Workmen's Compensation, § 87.50.

9. Effective September 1, 1967, the legislature enacted Minn.St. 176.041, subds. 2, 3, 4 and 5, limiting application of our statutes to injuries occurring outside this state.

representative said, "As far as I am concerned you have got yourself a job." That same day she was given free transportation to Miami for what she understood was a final interview, IQ test, and physical examination. She left for Miami the next day. While there, she was interviewed and, despite her relatively low IQ score, was hired "because of her personality," subject to passing a physical examination. She was given an employment agreement, which required only her signature, and was directed to return for 4 weeks of training. She returned to Minneapolis, signed the employment agreement and had her signature acknowledged here by a Minnesota notary, returned to Miami, passed the physical examination, completed training, and was placed on the payroll in early November 1962, when she reported to Boston, Massachusetts. Her first assignment was to work on flights originating in that city. Contrary to employee's argument that she was in fact hired in Minnesota, the compensation judge and the court of appeals credited the testimony of Eastern's manager of employment in 1962 that all final hiring of stewardesses as a matter of company policy was done only at Eastern's home office in Miami, and that the Minneapolis interviewer had no authority to hire. Neither the Minneapolis interviewer, since deceased, nor the Miami interviewer testified before the compensation judge.[10]

During the 1½ years she worked out of Boston, employee returned for personal visits to Minnesota four or five times. Eastern, in keeping with company policy, supplied her free transportation. Early in 1964, she requested and was granted a transfer to Miami in the hope that her duties would include flights to and from

Minnesota. At that time and since 1962, Eastern had an office at the Minneapolis-St. Paul International Airport with one flight arriving and departing from there each day. The number of such flights increased during her remaining years of employment. Eastern therefore qualified as an insured employer under our compensation laws. During the 6½-year remaining period, she returned to Minnesota to visit her family and friends every 3 or 4 months as well as worked some flights from Miami to Minneapolis-St. Paul. At no time during her employment did she consider her residence outside the state to be permanent, as the very nature of the employer's business and her duties required extensive travel outside any location to which she might be assigned.[11] Due to the increasing frequency of blackouts she was experiencing, she voluntarily terminated her employment in August 1970. That same month she returned to Minnesota and married Mr. Follese, a Minnesota resident. During her acute illness in 1972 and 1973 and her temporary marital separation, she received public assistance as a claimed consequence of her work-related injuries. Unaware of the causal relationship between her blackouts and her 1964 head injury until December 1973, she made no claims for compensation benefits until March 1974 in this state. Since Florida does not regard the voluntary payment of compensation benefits as tolling the statute of limitations, Minnesota, it is claimed, remains the only forum in which she is potentially afforded an opportunity to adjudicate the merits of her claims.

█ Applying the legitimate-interest test to employee's pre-1967 injuries, we are persuaded that the following factors justify entertaining jurisdiction to adjudicate those

10. The latter submitted his affidavit following the hearing supporting the testimony of the employment manager.

11. During the period of her employment she maintained her parents' home as her Minnesota address, retained a Minnesota driver's license until 1966, and did not register to vote in either Minnesota or Florida. She did, however, obtain a Florida driver's license in 1966 when directed to do so by a Florida police officer.

Also, her mother declined jury duty for her in Minneapolis in 1965 because she was "working" in Florida. She paid no Minnesota income taxes for those years. While living in Boston she rented an apartment with "two other girls" and while in Miami, with four other "girls," except for the last year of her employment when she lived alone and had a telephone listing in the Miami telephone directory in her name.

claims, whatever their merits: (1) Eastern's localization of business in this state and its qualifying as an insured employer under our laws; (2) employee's receipt of public welfare payments for the alleged consequences of her admittedly work-related injuries; (3) her lack of permanent residence outside this state by reason of the nature of employer's business and employee's duties requiring extensive travel outside of any location to which she might be assigned; (4) the likelihood that if this state refuses to afford her a forum in which to adjudicate the merits of her pre-1967 work-related claim she will be precluded from seeking any relief; and (5) the nature of her employment relationship. While we acknowledge that the court of appeals' approval of the compensation judge's finding that the contract for hire was made in Florida has sufficient evidentiary support when the record is considered as a whole, our reading of the record leaves grave doubt as to whether, in view of Eastern's 1962 employment procedures of locally screening applicants and creating the expectant employment relationship within this state, a contrary finding could not have been equally supported. See, *Aleckson v. Kennedy Motor Sales Co.,* 238 Minn. 110, 55 N.W.2d 696 (1952). Any test that requires a determination of a legitimate governmental interest is not sus-

ceptible of mechanical application. The facts of each case must be weighed in determining whether the requisite interest is present. With respect to employee's pre-1967 injuries, our decision affords no more to employee than the right to have her claims adjudicated on their merits in a forum that is surely more convenient to her, and by the nature of employer's business and its qualification as an insured, imposes no substantial burden on it to assert all of its defenses to the merits of her claims.

■ Except as this disposition may provoke a legislative reexamination of what should be the range of extraterritorial application of our laws as applied to the airline and other similar industries, our decision has precedential significance only for work-related injuries occurring before passage of Minn.St.1967, § 176.041, subds. 2, 3, 4, 5, in 1967, which are therefore governed by the common-law tests that we have applied. With respect to employee's July 5, 1968, back injury, Minn.St.1967, § 176.041, subds. 2, 3, 4, 5,[12] clearly precludes extraterritorial application of our statutes to that injury. Under the facts as found, employee was not hired in this state and she was not injured outside of the state while performing the primary duties of her employment

12. Minn.St.1967, § 176.041, provides in pertinent part: "Subd. 2. If an employee who regularly performs the primary duties of his employment within this state, or who is hired to perform the primary duties of his employment within this state, receives an injury while temporarily outside of this state in the employ of the same employer, the provisions of this chapter shall apply to such injury. If a resident of this state is transferred outside the territorial limits of the United States as an employee of a Minnesota employer, he shall be presumed to be temporarily employed outside of this state while so employed.

"Subd. 3. If an employee hired in this state by a Minnesota employer, receives an injury while temporarily employed outside of this state, such injury shall be subject to the provisions of this chapter. If the employer's business is in Minnesota and the employee's residence is in Minnesota, employment outside of this state shall be considered temporary.

"Subd. 4. If an employee who regularly performs the primary duties of his employment outside of this state or is hired to perform the

primary duties of his employment outside of this state, receives an injury within this state in the employ of the same employer, such injury shall not be covered within the provisions of this chapter if the employer has provided workmen's compensation coverage for such injury within the laws of any other state or any possession or protectorate of the United States whether or not the injury is compensable under the law; provided, however, that if such employee regularly resides in Minnesota and regularly performs a part of such employment duties within the state of Minnesota, he shall be entitled to such compensation under the provisions of this chapter for such injury; provided further, that any employee who has worked for the employer in whose employment the injury occurred for six or more consecutive weeks in this state shall be deemed to have regularly resided herein.

"Subd. 5. *Except as specifically provided by subdivisions 2 and 3 of this section, injuries occurring outside of this state are not subject to the provisions of this chapter."* (Italics supplied.)

here, nor was she injured within this state. Reversed as to employee's pre-1967 claims and affirmed as to her 1968 claim.

Reversed in part; affirmed in part.

OTIS, J., took no part in the consideration or decision of this case.

PETERSON, Justice (concurring specially).

I concur, with hesitation, in what is a result forecast in the dissenting opinion of Mr. Justice Otis in *Houle v. Stearns-Rogers Mfg. Co.*, 279 Minn. 345, 355, 157 N.W.2d 362, 369 (Peterson, J., joining in dissent):

"* * * The court has abandoned the requirement that an employer have a localized business in Minnesota as a prerequisite to imposing liability under the Workmen's Compensation Act. Predictably, the next step will be to apply the Minnesota act regardless of where a Minnesota resident is hired or injured."

The court's opinion indicates today's decision is without precedential significance except for work-related injuries occurring before the enactment of Minn.St.1967, § 176.-041. It is, at best, a marginal case and should, as the court invites, "provoke a legislative reexamination of what should be the range of extraterritorial application of our laws as applied to the airline and other similar industries."