### 32315. ALFORD *v.* ATLANTIC COAST LINE RAILROAD CO.

DECIDED JUNE 15, 1949. REHEARING DENIED JULY 12, 1949.

*T. J. Lewis, Richard M. Maxwell,* for plaintiff.

*William B. Spann Jr., Alston, Foster, Sibley & Miller,* for defendant.

MacINTYRE, P. J. This case presents a single question: Is the evidence sufficient in law to maintain the issue of fact made by the pleadings? In other words, is there sufficient evidence from which the jury could have found that the alleged negligence of the defendant contributed in whole or in part to the plaintiff's injuries as set out in the petition; that is to say, does the evidence prove the case as laid? The negligence attributed to the defendant was, that the defendant did not provide the plaintiff with a reasonably safe place to work, that it failed to warn him of the presence of the obstruction, and that a fellow employee failed in his duty to keep a lookout along the track and, in the presence of the danger, failed to warn the plaintiff so that he might extricate himself, and failed to signal the engineer to stop the train so as to avoid the plaintiff's striking the obstruction. Title 45, section 51, of the U. S. Code Annotated, provides: "Every common carrier by railroad while engaging in commerce between any of the several states or territories . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment." Title 45, section 53, of the U. S. Code Annotated provides: "The fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." Title 45, section 54, of the U. S. Code Annotated provides: "That in any action brought against any common carrier under or by virtue of any of the provisions of this chapter to recover damages for injuries to . . any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where such injury . . resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." In a decision of the Supreme Court of the United States (Tiller v. A. C. L. R. Co., 318 U. S. 54, 63 Sup. Ct. 444, 87 L. ed. 610), delivered by Justice Black, February 1, 1943, in which all the Justices concurred, Justice Frank-

furter, concurring specially, it was held: "1. The 1939 amendment of the Federal Employers' Liability Act, which provides that in an action against a common carrier under the act to recover damages for injury or death of an employee, 'such employee shall not be held to have assumed the risks of his employment in any case where such injury or death resulted in whole or in part from the negligence of any of the officers, agents, or employees of such carrier' obliterated from that law every vestige of the doctrine of assumption of risk. 2. The rule of decision in cases under the act as amended is the doctrine of comparative negligence, which permits the jury to weigh the fault of the injured employee and to compare it with the negligence of the employer, and thereupon to do justice to both. 3. The question of the negligence of the employer is to be determined by the general rule which defines negligence as the lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances; or doing what such a person under the circumstances would not have done. The standard of care must be commensurate to the dangers of the employment. 4. Under the act as amended, no case is to be withheld from a jury on any theory of assumption of risk, and questions of negligence should be submitted to the jury with appropriate instructions." In Wilkerson v. McCarthy, 336 U. S. 53 (69 Sup. Ct. 413, 93 L. ed. 403), it was said, "In determining whether there is sufficient evidence to submit an issue of negligence to the jury, it is necessary to look only to the evidence and reasonable inferences therefrom which tend to support the case of the litigant against whom a peremptory instruction [directed verdict in that case] has been given." In a special concurrence in the Wilkerson case Justice Douglas stated: "The basis of liability under the act is and remains negligence. Judges will not always agree as to what facts are necessary to establish negligence. We are not in agreement in all cases. But the review of the cases coming to the court from the 1943 term to date [January 31, 1949] and set forth in the appendix to this opinion shows, I think, a record more faithful to the design of the act than previously prevailed. . . From this group of cases three observations can be made: (1) The basis of liability has not been shifted from negligence

to absolute liability. (2) The criterion governing the exercise of our discretion in granting or denying certiorari is not who loses below but whether the jury function in passing on disputed questions of fact and in drawing inferences from proven facts has been respected. (3) The historic role of the jury in performing that function . . is being restored in this important class of cases."

Those wishing to pursue this subject further may do so by referring to collected cases appearing in the appendix to the opinion of Mr. Justice Douglas at page 71. Suffice it to say, that there was evidence (detailed below) which would support a jury finding of negligence on the part of the defendant and prove the case of the plaintiff as laid. The plaintiff testified: "I have been employed by the Atlantic Coast Line Railroad Company. I was working for them on the 26th day of May 1946 in the yards of the Export Terminals in Jacksonville. . . I was working different industries, under the instructions of the yardmaster. I had two other switchmen working under me—W. C. Fields and James Smith. . . The engineer's name was Ellis. . . We performed our duties with a steam locomotive. That engine was used for the purpose of moving cars. James Smith was following the engine. By that I mean he must stand on the footboard of the engine and give signals and put the engine on different tracks when the conductor and other yard men are not around, and couple up the engine to cars to be moved. Fields was the field man . . as a switchman working for the Atlantic Coast Line on that date, some of his duties were to assist me in every way and give signals, and follow my instructions. Some of my instructions to him that day were to spot cars wherever the industries wanted them, and use the hand brakes, and look out for the safety of the crew and the company's property. Somewhere around 3:30 in the afternoon I received instructions from the yardmaster, Mr. Wright. . . He told me to place the cars that I lined up for the Ford Motor Company. I was at the yard office then. That was possibly a mile or a mile and a quarter from where the cars were to go into the Ford Motor Company. I was to be off at four, and he said for me to hurry up down there and place them. I took my engine and the switch crew to the place he designated. . . I found these particular

cars that were to go into the Ford Motor Company plant. They were on the third track from the lead that goes into the Ford Motor Company. . . Foley Lumber Company tracks also lead off that line. . . I was on the Ford lead. All of those tracks are within the premises of Foley Lumber Company. . . As to what I told my crew when we got to these cars . . I instructed Fields to get on top of the cars and test the brakes, and if we had a brake to cut the car off. *I told him to look out for any obstruction that might be unsafe for the company property, a man or anything that might be unsafe.* There were six cars in this cut. . . A box car has a roof. . . Each and every car has a hand brake. They are located on the right end. The brake wheel with which you control the brake is on top, at the end near the top. There are different kinds of brakes. . . On the day in question switchman Fields climbed up that ladder on this end first. The cars were moving at that time. The other switchman was on top of the car next to the engine, six car lengths from me and Fields. A car is about 40 feet long. That would be about 240 feet. *He was put there to give signals to the engineer, signals that would be given by the man on top, Fields.* I don't know whether the track is real straight. . . Where we were that day, after we started, I could not see the engineer. The engineer would get signals, if any, along there through the man on top. I could not be seen by the engineer. At that time I had been working for the railroad company about three and one-half years. I was the foreman in charge of that crew. I took orders from the yardmaster. I had put cars into the Foley Lumber Company place prior to that, and I had put cars into the Ford Motor Company plant prior to that time. I was familiar with the custom and manner and practice in which cars were put into those places. . . That track leading into the Ford plant, after you get around the curve, is down grade. It leads to the end of the plant, some 17 or 18 car lengths inside the plant. Beyond the end of the track is the St. Johns River. To get cars into the Ford Motor Company plant, we shove them down that lead into the plant, and they run on into the plant, by their own momentum. We are not permitted to go into the plant with a switch engine. You just disconnect the cars and let them roll in. The track is on a down grade into the plant.

*It is the rule to be sure you have good brakes, because that is the only way in the world to do that particular movement, and you have to test the brakes, and to do that you wind up on the brake wheel until you get pressure, and you have the car rolling. You could not make that test with the car standing and tell whether or not you had a safe brake.* On this particular day, after I sent the switchman to the top of the car to test this brake, and I was hanging on the side to observe the brake, he did not say anything to me about any obstruction being on the track or near the track. I did not know that there were any obstructions on or near the track that I would not clear. I was thinking about my work at that particular moment, because it was most necessary to be exact. There could be no guesswork about it. If those cars had been shoved in without brakes, they would have gone into the St. Johns River—they would go through the Ford plant and on into the river. The man on top never did tell me that there were any obstructions. He did not give me any warning. I did not do any inspecting beside the brake. Standing right on the ladder or platform would enable the man to hold on to a grab iron and turn the [brake] wheel. He was on the end in the direction in which the car was going. It was the lead car that he was on and that I was on. I was on the side and he was on the end. He was at the top and I was near the ground. When he applied the brake, I had to hold on with one hand and reach down and look at the pressure on the brake wheel, and during that time, while I was doing that, was when I got hurt. I was bent over. You have to get down where you can see both wheels. There is no other way to make the test that I know of. While I was making that test, my undivided attention was on that brake shoe and brake wheel to see if I had a brake on that particular car. While I was in that position, my leg was broken by some kind of lumber unit block, they call them. . . I imagine one of them is about eight or nine inches wide and about three and a half or four feet long. They use them for stacking lumber on and a crane . . comes along and picks up that lumber and sets it over on a truck. I do not know how many of those were there. . . My leg hit those. They had to be close to the track. My leg came in contact with them. I didn't know they were there and had no reason to suspect that

they were there. I had not been in that yard on that track that day prior to that. . . No one told me that it was not safe to go down there. No one warned me that there was an obstruction near the track, and I did not know it was there. . . After I was hurt the car moved about five car lengths. When my foot came in contact with this obstruction, I hollered to Fields that my leg was broke, to give the signal to stop so he could get me down. He did not give the signal to stop from the top of the car. He climbed down and ran out to the side to give the signal. All he had to do was wave a stop signal, and the man on the first car would have given the same signal to the engineer. He would have relayed the signal that Fields gave him. I said that Fields was up on the end of this car. *There was nothing to prevent him from looking and seeing the obstruction and warning me. The reason I did not see it was that my undivided attention was on my work, testing those hand brakes. I was not thinking about anything else, except the safety of this movement. It was a part of Fields' duty to look out for obstructions. It was the duty of every one of the crew, and had he seen an obstruction, or anything of danger, it would have been his duty to give a warning, and give a signal to stop.*" We think that this evidence sufficiently demonstrates that a jury would be authorized to find or infer negligence on the part of the employee Fields, and the fact that there was additional evidence in the record which tended to contradict this evidence would not alter the rule that the question should have been left to the triers of fact. For a somewhat analogous case, see Ellis *v.* Union Pacific Railroad Co., 329 U. S. 649 (67 Sup. Ct. 598, 91 L. ed. 572). The court erred in granting the nonsuit.

*Judgment reversed. Gardner and Townsend, JJ., concur.*