**O. P. TEETS, Plaintiff,**

v.

**CHICAGO, SOUTH SHORE AND SOUTH BEND RAILROAD, a corporation, Defendant.**

**No. 54 C 92.**

United States District Court
N. D. Illinois, E. D.
Dec. 5, 1955.

John C. Mullen, Chicago, Ill., for plaintiff.

**342**

Joseph H. Hinshaw, Hinshaw, Culbertson, Moelmann & Hoban, Chicago, Ill., for defendant.

CAMPBELL, District Judge.

This is an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for injuries sustained by Otis P. Teets, an employee of the defendant railroad. Defendant's motion for a directed verdict at the close of all the evidence was taken under advisement pending the return of the jury's verdict. The jury found the defendant guilty and assessed the plaintiff's damages at $8,500. The defendant now moves, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., to have the jury's verdict, and the judgment entered thereon, set aside and to have judgment entered in accordance with its motion for a directed verdict. This motion has been fully briefed by the parties.

The plaintiff has been employed by the defendant for a period of 28 years. During this time, he has served exclusively as an engineer on defendant's trains. Tr. 61. On March 4, 1952, the plaintiff was operating defendant's Train No. 29, as he had done for about 4 years, when said train collided with the rear of defendant's Train No. 203 in the station located at Gary, Indiana. Tr. 62, 78.

On the night of the accident, Train 29 left the Randolph Street Station, Chicago, at 5:17 P.M. Tr. 157. Train 203 had departed from the same station about 9 minutes earlier. Train 29 proceeded along its way eastbound towards South Bend, Indiana, there being no scheduled stops between Calumet City and Gary. Upon reaching what is called the Pennsylvania overhead (where defendant's tracks proceed over the Pennsylvania Rail Road tracks, which run north and south at the overhead), it was dark, and it had been raining, sleeting and snowing, although it had stopped. Tr. 71.

Between the Pennsylvania overhead and the station at Gary, there are four signals controlling the approach of eastbound trains. There are, going east, a signal just east of the overhead, signal 593 at Marshall Street, signal 591 at Monroe Street, and what is called a "low switch stand" signal which is located just west of a switch located immediately west of the station. Signals 593, 591, and the low switch stand signal are of particular importance in this case.

It might be helpful, at this time, to describe the general area involved herein, the physical aspects of the signals and what the various colors displayed thereon mean to an engineer as he approaches each signal.

Signal 593 is approximately 21 feet high. On the top of the mast is an order board with three units in line in a vertical position. The top unit is about 18 feet above the rails while the bottom unit is about 16 feet. D.'s Ex. K. The top unit is green, the middle is yellow and the bottom unit red. D.'s Ex. E. Rule 10 of the defendant's operating rules states that red is an indication to stop; yellow, to proceed at restricted speed; and green, an indication merely to proceed. Signal 593 is located approximately 4,565 feet west of signal 591 on defendant's eastbound main line. D.'s Ex. K.

Signal 591 is identical to signal 593 except that there is an additional order board about 3 feet below the top order board. The lower order board consists of two units in line in a vertical position. The top unit is about 12 feet above the ground and the lower unit about 11 feet. D.'s Ex. K. The top unit on the lower board is yellow and the lower unit, red. D.'s Ex. E. If the signal on the top order board is yellow, the signal on the lower order board would be red, and an engineer would expect the eastbound main line to be clear. Tr. 51. If the signal on the lower order board is yellow, the signal on the top order board would be red, and an engineer would expect the switch immediately west of the Gary station to be lined so that an eastbound train would proceed off the eastbound main line onto track 2 at the Gary station. Tr. 54. It should be parenthetically observed here that Train 203 was standing on track 2

at the time of the collision. If the lower board displayed yellow, then it was the engineer's duty, under the rules, to proceed under restricted speed. Tr. 54. Signal 591 is located approximately 639 feet west of the low switch stand signal. Tr. 310; D.'s Ex. K.

The low switch stand signal is approximately 3 feet high. D.'s Ex. E. This signal indicates the position of the switch leading eastbound trains into the station at Gary. If the switch is open, the signal at the low switch stand would be red and an engineer of a train travelling east on the eastbound main would expect to proceed over the switch onto track 2. Tr. 55. Conversely, if the switch is closed, the signal at the low switch stand would be green and a train going east on the eastbound main line would proceed over the switch and remain on the eastbound main. The low switch stand signal is approximately 392 feet from the west edge of the south platform of the station. Tr. 310. Track 2 runs north of the south platform and the eastbound main track runs south of the platform. D.'s Ex. K.

Mr. Teets, the plaintiff, testified that as he came down the Pennsylvania overhead, he observed signals 593 and 591 to be green. The engineer's position on the defendant's trains is to the right of center on the lead car, much like the position of a motorman on Chicago's elevated-subway trains. The plaintiff testified that, after passing signal 593, and at about 300 feet west of Monroe Street, his attention was drawn to an automobile which was standing, going south, on the westbound track at Monroe Street and that there were some men trying to push the car off the track. Tr. 73, 74, 161. As he passed signal 593, the plaintiff was travelling at about 45 miles an hour, the maximum authorized speed over the streets and alleys in Gary. Tr. 32. The plaintiff testified that about 250 feet from signal 591 at Monroe Street, he observed this signal to be green, but that as he passed 591, he "got a glimpse" of yellow from the signal block. Tr. 75. At this time, Train 29 was travelling at about 35 miles an hour,

the plaintiff having begun to brake his train, preparing to stop at the Gary station. Tr. 163, 76. At signal 591 a 3° curve in the trackage begins. Tr. 310. The plaintiff admitted going around this curve up to a point between 200 and 260 feet from the low switch stand signal when he observed that signal to be red. Tr. 164. He testified that he then applied the emergency brake, but that the train continued past the open switch and collided with the rear of Train 203 which had been standing at track 2 at the station. On cross-examination, the plaintiff further admitted that, although he saw a "glimpse" of yellow at signal 591, he continued to within 200 feet from the red low switch stand signal without knowing exactly what color was displayed at the signal 591. Tr. 167. At the time of the collision, Train 29 was travelling at about 12 miles an hour. Tr. 165. The point of collision was on track 2 somewhere between the low switch stand and the west end of the south platform of the Gary station.

Mr. Paul Luscomb, a carmen's helper employed by the defendant, was called as a witness for the plaintiff. He testified, on direct examination, that he was operating the switch leading into the Gary station on the night in question. Tr. 100. He admitted that he had never taken an examination to qualify him as a carmen's helper. Tr. 101. He testified that, on the night in issue, he had lined the eastbound main so that Train 203 would proceed onto track 2. Tr. 101. After lining the eastbound switch, he went over to line a switch on the westbound main so that two cars could be brought in onto track 2 and coupled to the back end of Train 203. Tr. 101. Plaintiff concluded his examination of the witness at this point.

Called on behalf of the defendant, Luscomb testified that, after opening the switch to allow Train 203 to go onto track 2, he did not thereafter change the switch. Tr. 345. He further testified that there was a two-minute interval between opening the switch and the collision in issue. Tr. 345. On cross-examination, Luscomb admitted passing the

eastbound switch after he had lined the westbound main for the subsequent yard operations. Tr. 350. Luscomb further admitted that the switch in question had a lock on it but that he did not lock it after he had opened the switch. Tr. 362. At the time of the collision, Luscomb was within 50 feet of the point of impact, standing between track 2 and an engine track located south of track 2. Tr. 364, 365.

Mr. Henry Lochmaier, the engineer of Train 203, testified that it was standard practice that Train 29 would unload its Gary passengers at Gary and pick up Train 203's "through passengers" for Michigan City and South Bend. Tr. 340. Train 203 would, in turn, pick up Train 29's local passengers for intermediate points between Gary and Michigan City. Mr. Lochmaier testified that he arrived at Gary, on the night in question, at about 6:02 P.M. and that his train was standing on track 2 for about 2 minutes when the collision occurred at 6:04 P.M. Tr. 326. The scheduled arrival time at Gary for Train 203 is 6:00 P.M. P.'s Ex. 34. Mr. Lochmaier further testified that the weather was clear as he approached Gary and that the rail was dry. Tr. 330, 331. He testified that when he stopped at signal 591, he could see the signal at the low switch stand and that it was red at the time. Tr. 421.

Plaintiff's theory of the case, as enunciated in his second amended complaint, is that the defendant, through its agent, Luscomb, opened the switch in issue without giving adequate warning to the plaintiff's train. Plaintiff further alleges that the defendant was negligent in maintaining employees who were not sufficiently trained in operating switches and signals on the defendant's right of way. Defendant contends that it was not guilty of any negligence and that the plaintiff's own negligence was the sole, proximate cause of the collision in question.

In support of his charge of negligence, plaintiff argues that Luscomb violated Rules 104, 104(a) and 104(b) of the defendant's operating rules by not relining the switch for the eastbound main and by not locking it.

Rule 104 provides, in part, as follows:

"Conductors are responsible for the position of switches used by them and their trainmen, except where switchtenders are stationed. Switches must be properly lined after having been used.

"A switch must not be left open for a following train unless in charge of a trainman of such train."

Rule 104(a) specifies, in part, that:

"All main track switches and those required by rule and special instructions to be locked must be left in that condition."

Rule 104(b) requires that:

"Switches must not be unlocked or unsecured nor should trainmen or other employes stand near them under conditions in which mishandling or imperfect adjustment might cause accident. They will, if practical, stand on the opposite side of the track from the switch stand."

Although inroads have been made on the defenses that might be asserted in actions arising under the Federal Employers' Liability Act, the fact remains that this statute is a negligence statute and not a compensation law. The assumption that an employer under the Act is an insurer of its employees is clearly erroneous. Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497. In order to recover, it is incumbent upon an injured employee to prove that his employer was guilty of negligence and that such negligence was the proximate cause of the injury. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 453, 87 L.Ed. 610.

In the instant action, the plaintiff bottoms his case on the assertion that signal 591 was "thrown in his face", and that the resulting accident was unavoidable on his part. I have carefully reviewed the record in this case and I find no evidence that the signal was "thrown in the plaintiff's face". Plaintiff asserts

that as he passed 591 he "got a glimpse of yellow" from the signal block. This, however, is not competent evidence that the signal was changed as he was passing it for it is one thing to say that the signal was changed when he was passing it, and quite another thing to say that, as he passed the signal, he "got a glimpse of yellow from the signal block." The former case admits of an objection on the grounds of the timeliness of the signal; the latter case does not. The plaintiff testified that from 300 feet west of signal 591, he observed a car to be standing across the westbound main at Monroe Street. He then testified that from 250 feet west of 591, he observed the signal to be green. There is no evidence that the plaintiff again considered the signal at 591 after passing the point 250 feet west of the signal until he came abreast of it, when he says he got a glimpse of yellow. It might have been that the signal at 591 was changed to yellow when the plaintiff was 200 feet west of the signal and that he failed to notice the yellow indication until he came abreast of 591. The conclusion is that the plaintiff completely disregarded the signal at 591 after having observed it from 250 feet west, and that he assumed that it would remain green, as normally was the case. Plaintiff's counsel argue that the plaintiff's attention was drawn to the car on the tracks and that he therefore could not observe the signal. This argument is totally without merit since an engineer is not excused from observing signals merely because a possible source of danger might appear. Nonobservance of the governing signals might pose an even greater danger.

The conclusion that the plaintiff disregarded the signal at 591 as he approached it is further buttressed by the fact that an engineer of a train such as we have in this case has an almost unlimited scope of vision from his position on the train. He sits at the immediate front of the lead car and could, in the proper exercise of diligence, observe not only any possible obstruction but the signals along the road bed as well.

I conclude, therefore, that there is no evidence in this case to support plaintiff's argument that signal 591 "was thrown in his face", and that as he approached 591 he totally disregarded the signals thereon until he reached a point immediately abreast of the signal.

This conclusion is supported by the testimony of the switchman, Mr. Luscomb. He testified that after throwing the switch to allow Train 203 to proceed onto track 2, he did not thereafter reline the switch. This would mean that from about one and a half minutes after 6:00 P.M. until the time of the collision, the lights at signal 591 were red over yellow. Plaintiff examined Luscomb on his case in chief and was given ample opportunity on cross-examination when Luscomb was called during the defendant's evidence, but nothing was elicited from him which would either contradict or impeach his testimony. To subscribe to the plaintiff's position in this case that the switch was "thrown in his face", would necessitate a finding that Luscomb, after having once lined the switch for track 2, relined it for the eastbound main and then once again lined it for track 2. Such a finding would be a mere inference, unfounded and totally unsupported by, and contradictory to, the evidence in this case.

It is interesting to note that Luscomb's testimony is corroborated by a statement signed by the plaintiff on June 13, 1952, in the presence of the Superintendent of Transportation for the defendant railroad, and Calvin L. Acres, general chairman of the Brotherhood of Locomotive Firemen and Enginemen. In this statement, Teets stated that he misinterpreted the signal indication (presumably at 591) to be yellow over red, rather than red over yellow. Tr. 188. The plaintiff asserted that he signed this statement in order to get back to work. If the plaintiff signed what he knew to be a false statement, then this would be evidence affecting his credibility in this case. If the statement is true, then it corroborates the weight of evidence adduced in this case.

Assume, however, for purposes of argument, that signal 591 was changed to yellow as the plaintiff came abreast of it, the plaintiff, on cross-examination, admitted that although he got a glimpse of yellow at 591, he nevertheless continued to within 200 feet from the low switch stand not knowing whether the signal displayed at 591 was a high or low yellow. In other words, he travelled over 400 feet not knowing whether signal 591 indicated that the switch at the Gary station was open or closed. If the switch were closed, the plaintiff would know that his train would continue on the eastbound main into the station; however, if the switch were open, the plaintiff would know that his train would proceed onto track 2 where he would also know train 203 would be standing. The alternatives were directly opposite. If the switch were closed, the result would be routine; if the switch were open, the result would be disaster. Notwithstanding the possibility that the disastrous alternative might occur, plaintiff travelled over 400 feet beyond signal 591 to a point within 200 feet of the low switch stand, where he observed the switch to be open and the signal red. He immediately applied the emergency brake which was then too late to avoid the ensuing collision.

■■ The inquiry is, in the words of Mr. Justice Frankfurter in his concurring opinion in the Tiller case, supra, did the plaintiff's conduct "depart from that of a reasonably prudent employee in his situation?" There can be no serious doubt that a reasonably prudent engineer in the instant situation would have acted in a different manner than the plaintiff herein. He would have treated the signal at 591 as requiring the more cautious conduct of the two alternative possibilities. That is, a reasonably prudent engineer not knowing exactly what the indication at signal 591 was, would have treated it as indicating red over yellow rather than yellow over red. He would then know that the switch in issue was open and would proceed at restricted speed prepared to stop short of any obstruction. (Rule 12(c) of the defendant's Special Instructions.) In this case, restricted speed would mean such speed at which Train 29 could be stopped short of the open switch, or certainly short of Train 203. However, the plaintiff did not so conduct himself in this case but proceeded over 400 feet beyond 591 not knowing what the signal was. By this time, any action on his part could only lessen the results of the collision, rather than avoid it. I hold, therefore, that the plaintiff's conduct in going past signal 591, not knowing exactly what signal was displayed thereon and not preparing his train to stop short of the open switch, was such conduct that departs from what a reasonably prudent employee would have done in the same situation.

■ The question now presented for decision is whether the plaintiff's negligence is the only negligence in this case, as contributory negligence in cases arising under the F.E.L.A. merely reduces, rather than bars, the amount of recovery. 45 U.S.C.A. § 53. Having determined that the plaintiff failed to prove that the switch in issue was opened without giving adequate warning, there remains only plaintiff's charge that Luscomb was not a qualified employee and that he otherwise violated the operating rules of the defendant. In this regard, plaintiff argues that Luscomb had never taken a qualification examination and that he violated the defendant's rules in not locking the switch in issue and in not relining the switch for the eastbound main after having used it to switch Train 203 onto track 2.

■ It is true that Rule C of the defendant's General Rules provides that employees "must pass the required examination". However, proof that an employee never took the required examination is not, in and of itself, proof that the employee was not otherwise qualified to do his job. Nor can it be considered in conjunction with Luscomb's failure to lock the switch on this one occasion as proof that he was not a qualified employee. Furthermore, Luscomb's failure to take the examination and his over-

sight in not locking the switch cannot possibly be considered as the proximate cause of the collision in this case.

■ Plaintiff's argument that the defendant was negligent in that Luscomb violated the rules by not relining the switch for the eastbound main is also without merit since the evidence clearly shows that the switch had to be left open in order to permit two cars subsequently to be switched off the westbound main onto the eastbound main and track 2, and coupled to the rear of Train 203. Thus these "yard operations" required that the switch remain open. However, even assuming that there was no cause to leave the switch open, the open switch cannot reasonably be said to be the proximate cause of the accident in this case as there was no evidence that the signals controlled by the switch were not working and giving the proper warning.

■■ The proximate cause of the accident clearly is the plaintiff's negligence in running through signal 591 without knowing exactly what signal was displayed thereon and proceeding without restricting his speed in order to stop short of any obstruction which, in this case, was the open switch, or certainly Train 203. To permit the plaintiff to recover on the meagre showing in this case would, in effect, obliterate the theory of proximate cause from the law. The defendant railroad had the right to carry on its business in a reasonable manner under the circumstances. It had the right to leave the switch in question open for these "yard operations", provided it gave proper notice to oncoming trains that the switch was open. In this case, there is no evidence that the proper signal was not given at 591. Plaintiff proceeded past the signal not knowing what indication was displayed thereon, relying on what normally and usually was the case when he approached the Gary station rather than on what signal 591 actually showed to be the case on the particular day of the accident. Indeed, the plaintiff's negligence is the only negligence adduced in this case.

In reaching this conclusion, I am not unmindful of the Supreme Court's admonition in the Tiller case, supra, where it states, 318 U.S. at page 67, 63 S.Ct. at page 451, that the defense of assumption of risk "must not, contrary to the will of Congress, be allowed recrudescence under any other label in the common law lexicon". That is, I am well aware of the warning that the defense of assumption of risk cannot be raised under the identity of such concepts as nonnegligence or contributory negligence. Although the Tiller case, supra, held that the defense of assumption of risk has been abolished in toto in all F.E.L.A. cases, Mr. Justice Black, nevertheless, went on to state, at page 67 of 318 U.S., at page 451 of 63 S.Ct. of the Court's reported opinion, that the Act of 1908 and the amendment of 1939 left "for practical purposes only the question of whether the carrier was negligent and whether that negligence was the proximate cause of the injury".

In the present case, the plaintiff proceeded past a signal not knowing what it was and not reasonably restricting his speed under the circumstances. He assumed a risk of his own making and not a risk created by his employer or his particular occupation. The Court is not presented in this case, therefore, with the problem of assumption of risk; it is presented with such conduct on the part of the plaintiff as departs from what a reasonably prudent man would have done in this situation, said conduct being the sole, proximate cause of the plaintiff's injuries.

■ In accordance with the views expressed, I therefore hold as a matter of law that the plaintiff utterly failed to establish any negligence on the part of the defendant and that the plaintiff's own negligence was the sole, proximate cause of the accident in question. I conclude that the jury's verdict in this case is against the manifest weight of the evidence adduced and that it, together with the judgment entered thereon, must be set aside.

■ The defendant's motion for a directed verdict, taken under advisement

pursuant to Rule 50(b) at the conclusion of all the evidence, is hereby granted. The jury's verdict and the judgment heretofore entered thereon is hereby vacated and set aside. Judgment is hereby entered for the defendant, in accordance with its motion and the case is dismissed at plaintiff's costs.